STATE OF NEBRASKA, APPELLEE, V. TONY L. HAYNIE, APPELLANT.

476 N.W.2d 905

Filed November 15, 1991.   No. 90-453.

Thomas M. Kenney, Douglas County Public Defender, and Timothy P. Burns, and Phillip G. Wright for appellant.

Don Stenberg, Attorney General, and Elaine A. Chapman for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

HASTINGS, C.J.

Defendant, Tony L. Haynie, appeals from the bench trial convictions of six counts of robbery and one count of attempted robbery and his sentences to consecutive terms of imprisonment totaling not less than 68 nor more than 185 years. He assigns as error the admission of his confession into evidence and the excessiveness of the sentences.

Thirteen robberies had occurred in Omaha in which the suspect had been identified as a tall and slender black male around 20 years of age with short hair. The suspect was reported to have a red eye and used a cloth covering over his arm to conceal an alleged weapon. An anonymous tip was provided naming the defendant as the alleged robber. The anonymous caller described the defendant as a thin 28-year-old black male, 6 feet 1 inch tall, with short hair. According to the caller the suspect was unemployed, but had large sums of money and had told friends that he was going to rob 7 Eleven stores to pay for drugs. Robberies had in fact occurred at a 7 Eleven store, a Goodrich Dairy store, and doughnut, pharmacy, and grocery stores, and a robbery had been attempted at a Kwik Shop. The caller said that the suspect had a red eye as a result of a fight with "Crips," was known as Tony and Slim, and could be found occasionally at 4226 Wirt Street.

Police officers who had investigated the robberies reported that the suspect was unemployed, but had money and used crack cocaine. Following receipt of the anonymous tip a general police broadcast was issued for Haynie's arrest. The defendant was not found at the Wirt Street address, but neighbors described a car in which they had seen Haynie. After a police officer located the car, the defendant was found at a residential address and arrested. The defendant was advised of his constitutional rights and indicated that he was willing to make a statement. The defendant then confessed to committing 13 robberies. The interrogating officer denied that he made any promises or threats in exchange for the defendant's statement, but said that he told the defendant during the questioning that he would make a report and indicate that the defendant talked freely, without any hesitation, and that would probably be taken into consideration on how many cases were filed against

him. The defendant in fact was 6 feet 3 inches tall, weighed 172 pounds, was 29 years of age, and had a red eye when he was arrested.

Defendant made a pretrial motion to suppress all statements made by him to police officers because they were not freely and voluntarily made, were coerced by threats and promises, and were the fruit of an unlawful arrest. The motion was overruled, the defendant waived his right to a jury trial, and the parties stipulated that the police reports would be the only evidence adduced at trial. However, defendant renewed his objection to the admission of his statement. Other than the claimed excessiveness of the sentences, this is the only issue in dispute. The presentence investigation report revealed that the defendant had been fined $25 in 1985 for a welfare fraud conviction. The trial court noted that in most of the robberies the defendant told the victims that he had a gun. Following trial and conviction the defendant was sentenced as previously noted.

We first deal with defendant's claim that his arrest was not lawful and therefore any confession was the "fruit of the poisonous tree."

When a law enforcement officer has knowledge, based on information reasonably trustworthy under the circumstances, which justifies a prudent belief that a suspect is committing or has committed a crime, the officer has probable cause to arrest without a warrant. The key to a lawful arrest without a warrant is reasonable or probable cause to believe that a person has committed a crime. *State v. Badami*, 235 Neb. 118, 453 N.W.2d 746 (1990).

According to Neb. Rev. Stat. § 29-404.02 (Reissue 1989), a peace officer may arrest a person without a warrant if the officer has reasonable cause to believe that such person has committed a felony. Reasonable cause is explained in Neb. Rev. Stat. § 29-404.03 (Reissue 1989) as follows:

In determining whether reasonable cause exists to justify an arrest, a law enforcement officer may take into account all facts and circumstances, including those based upon any expert knowledge or experience which the officer in fact possessed, which a prudent officer would

judge relevant to the likelihood that a crime has been committed and that the person to be arrested has committed it, and for such purpose the officer may rely on information he receives from any informant whom it is reasonable under the circumstances to credit, whether or not at the time of making the arrest the officer knows the informant's identity.

According to § 29-404.03 an anonymous tip may be considered along with other facts and circumstances. The U.S. Supreme Court has held that an anonymous letter can provide the probable cause requisite for a search warrant. See *Illinois v. Gates*, 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983). The fourth amendment to the U.S. Constitution makes no distinction in the standards applicable to a determination of probable cause for arrest and probable cause for search and seizure. *State v. Dussault*, 193 Neb. 122, 225 N.W.2d 558 (1975). *Gates* is therefore relevant to the case at bar, even though it concerned probable cause requisite for a search warrant rather than for an arrest.

The Court in *Gates* rejected the rigid test of veracity or reliability and basis of knowledge and adopted the totality-of-the-circumstances test for determining whether an informant's tip establishes probable cause for issuance of a warrant. The Court noted that an informant's veracity, reliability, and basis of knowledge are all highly relevant in determining the value of the report, but that they should not be viewed as entirely separate and independent requirements to be rigidly exacted in every case. A deficiency in one may be compensated for by a strong showing as to the other. The Court explained that probable cause is a fluid concept dependent on the assessment of probabilities in particular factual contexts which cannot be reduced to a neat set of legal rules. The Supreme Court recognized the following regarding anonymous citizen informants:

> [Anonymous] tips, particularly when supplemented by independent police investigation, frequently contribute to the solution of otherwise "perfect crimes." While a conscientious assessment of the basis for crediting such tips is required by the Fourth Amendment, a standard that

leaves virtually no place for anonymous citizen informants is not.

*Illinois v. Gates, supra* at 462 U.S. at 237-38.

The Nebraska Supreme Court has further explained the following concerning probable cause for a warrantless arrest based on information from an informant:

" 'When considering the sufficiency of probable cause based on information supplied by an informant, it is important to distinguish the police tipster, who acts for money, leniency, or some other selfish purpose, from the citizen informer, whose only motive is to help law officers in the suppression of crime.

. . . .

" 'In the latter the rule of prior reliability is considerably relaxed for several reasons. In the first place the citizen informer has rarely had any earlier experience in reporting suspected criminal activity. Furthermore, unlike the professional informant, he is without motive to exaggerate, falsify or distort the facts to serve his own ends.

" 'Reliability still must be shown, but it may appear by the very nature of the circumstances under which the incriminating information became known. Any other rule would lead to the totally unacceptable result that public-spirited citizens interested only in law enforcement could seldom furnish information sufficient to establish probable cause.' . . ."

*State v. Blakely*, 227 Neb. 816, 822-23, 420 N.W.2d 300, 304-05 (1988).

The defendant contends that there was a wide variation in the descriptions of the robbery suspect provided to the police officers. The descriptions of the suspect as a man between 20 and 30 years old and varying from 5 feet 5 inches to 6 feet 2 inches tall and from 120 to 155 pounds were not that much of a variation from the actual physical characteristics of the defendant previously mentioned. With the addition of the "red eye" description and the independent investigation by the police officers, there certainly was probable cause to believe that the defendant was the man who had been committing these

robberies.

The more perplexing question deals with the issue of voluntariness. Haynie points out that the State must show that the statement, admission, or confession of the accused was given freely and voluntarily and was not the product of any promise or inducement, direct or implied, *no matter how slight,* before it will be admitted into evidence. *State v. Hall,* 237 Neb. 169, 465 N.W.2d 150 (1991).

The basis of the "no matter how slight" rule in Nebraska apparently was first identified in *State v. Mayhew,* 216 Neb. 761, 765, 346 N.W.2d 236, 239 (1984), wherein this court said:

> The holding that any inducement made by a person in authority to a person charged with a crime to obtain a statement or confession will render that statement or confession not voluntary and therefore inadmissible has been long established in our law. In *Bram v. United States,* 168 U.S. 532, 542-43, 18 S. Ct. 183, 42 L. Ed. 568 (1897), the Supreme Court of the United States quoted with approval from a textbook stating: " 'But a confession, in order to be admissible, must be free and voluntary: that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight . . . .' "

This court has restated this rule many times in opinions following *Mayhew,* to the point where it almost appears to be a per se rule. However, that is not the case.

*Tippitt v. Lockhart,* 859 F.2d 595 (8th Cir. 1988), *cert. denied* 490 U.S. 1100, 109 S. Ct. 2452, 104 L. Ed. 2d 1007 (1989), involved an in-custody statement by a suspect in an aggravated robbery and attempted capital murder case wherein the defendant gave a written statement in which he admitted he was the driver of the getaway car. Two of defendant's accomplices were charged with aggravated robbery and attempted capital murder. The officers who had arrested defendant promised not to charge him with attempted capital murder in return for his statement. He was given the *Miranda* warnings, following which he gave a statement which was used against him at his trial on charges of aggravated robbery and theft. As promised, he was not charged with attempted capital murder.

In finding that subsequent cases have not applied the *Bram* standard literally, the *Tippitt* court cited the following from *United States v. Grant*, 622 F.2d 308, 316 (8th Cir. 1980):

> While the *Bram* test has long been followed, it has not been interpreted to be applied on a strict, *per se* basis. [Citations omitted.] Rather, as expressed by the Supreme Court, determinations of voluntariness are based upon an assessment of all of the circumstances and factors surrounding the occurrence when the statement is made. [Citations omitted.] This flexible standard allows for judicial determinations of voluntariness in myriad situations without such decision making being hampered by rigid and potentially artificial restraints. The "totality of the circumstances" inquiry requires the reviewing court to investigate and analyze "both the characteristics of the accused and the details of the interrogation." [Citation omitted.]

The *Tippitt* court also cited the following from *United States v. Ferrara*, 377 F.2d 16, 17 (2d Cir. 1967), *cert. denied* 389 U.S. 908, 88 S. Ct. 225, 19 L. Ed. 2d 225:

> That language [from *Bram*] has never been applied with the wooden literalness urged upon us by appellant. The Supreme Court has consistently made clear that the test of voluntariness is whether an examination of all the circumstances discloses that the conduct of "law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined * * *." [Citations omitted.]

The *Tippitt* court concluded that the *Bram* language had not been and should not be interpreted to require the exclusion of a statement given in exchange for a promise not to prosecute for an additional crime. The court noted that such a holding would be in conflict with the well-established rule that the totality of the circumstances must be considered in.determining whether the confession was the result of overbearing by the police authorities. The court concluded that such a promise is merely one of the circumstances to determine whether the statement was freely and voluntarily given. Although the present case does not concern an admission given as a result of a plea

bargain agreement, the interrogating officer's statement regarding the probable consideration of cooperation in determining the number of charges to be filed should likewise be merely one of the circumstances which determine whether the defendant's statement was freely and voluntarily given.

A nonexhaustive list of potentially material considerations in determining the voluntariness of statements in the context of inducements by prosecuting authorities includes whether (1) defendant is in custody at the time of the statement, (2) defendant is alone and unrepresented by counsel, (3) the promise or inducement is initiated by prosecuting officials as opposed to defendant or someone acting on his behalf, (4) defendant is aware of his constitutional and other legal rights, (5) the potentially incriminating statement is part of an abortive plea bargain, (6) the promise or inducement leading to the statement is fulfilled by prosecuting authorities, and (7) defendant is subjected to protracted interrogation or evidence appears on the record to show that coercion precludes the statement from being knowing and intelligent. *United States v. Williams*, 447 F. Supp. 631 (D. Del. 1978). The *Williams* court concluded that the totality of circumstances must be examined in order to evaluate the voluntariness of an induced confession and that adherence to a per se suppression doctrine is unsatisfactory.

*Tippitt v. Lockhart*, 859 F.2d 595, 598 (8th Cir. 1988), concluded: "After considering the age and education of appellant, and the nature and extent of the interrogation, we conclude that the written confession given by appellant was the product of his rational and voluntary decision and that the officers' promise did not coerce or overbear his free will."

Upon the determination that the "however slight" rule is not a per se rule, it is apparent that whether a defendant's statements resulted from an officer's promise is a question of fact. We have said in the past that in reviewing the decision of the trial court in this respect, we will not reverse that decision unless it was clearly wrong and, on the other hand, that a finding that a confession was voluntarily made will not be overturned on appeal absent an abuse of discretion. See *State v. Hall*, 237 Neb. 169, 465 N.W.2d 150 (1991). These statements

laid side by side are obviously conflicting, but are simply repetitive of similar statements made in earlier cases.

We take this opportunity to set forth what we perceive to be the correct rule, and that is that a determination by the trial court that a statement was made voluntarily will not be disturbed on appeal unless clearly wrong. See *State v. Lamb*, 213 Neb. 498, 330 N.W.2d 462 (1983). See, also, *State v. Hall, supra*.

Although not cited as authority, the reasoning of Justice Boslaugh in his one-judge opinion *State v. Muenchau and Brown*, 209 Neb. 552, 308 N.W.2d 824 (1981), is quite compelling. He states at 554, 308 N.W.2d at 825-26:

> At the suppression hearing, [Deputy] Marker testified that "John [Brown] was told the same thing that we tell anyone else that comes in. We cannot promise him that he will have a lighter sentence, that anything will happen, that normally when a person cooperates with the court, that the court takes that into consideration."

The case *State v. Smith*, 203 Neb. 64, 66, 277 N.W.2d 441, 443 (1979), where a juvenile was told by an officer that "if the defendant cooperated with the police he would attempt to have the matter transferred to juvenile court," was distinguished in the opinion of Justice Boslaugh. He said, "Here no such benefit was offered to the appellee in return for making a statement. The fact that the defendant had 'cooperated' by giving a statement to the deputy sheriff would be readily apparent to the county attorney." 209 Neb. at 555, 308 N.W.2d at 826.

Cited in *State v. Muenchau and Brown, supra*, was the case *People v. Higgins*, 50 Ill. 2d 221, 278 N.E.2d 68 (1972), *cert. denied* 409 U.S. 855, 93 S. Ct. 195, 34 L. Ed. 2d 100. We quote again the language of Justice Boslaugh from the *Muenchau and Brown* opinion:

> In *Higgins*, the defendant and several other persons, including his sister, were arrested as suspects in the shooting death of a woman. In the course of a conversation with a police detective, defendant, in response to a question from the detective, asked: " 'If I tell the truth would you let the other people go?' Detective Davis answered that he had no authority to release anyone

who was arrested and charged and that only the State's Attorney or judge could do so, but that, if defendant told the truth, the State's Attorney would take this into consideration." [Citation omitted.] The Illinois Supreme Court found that these remarks did not render defendant's subsequent inculpatory statement involuntary. 209 Neb. at 555, 308 N.W.2d at 826.

In *State v. Thomas*, 232 Neb. 490, 441 N.W.2d 186 (1989), the defendant, after being read his rights, was told by the interrogating officer that he was facing a possible jail sentence and if the defendant revealed the source of the marijuana, there might be a possibility that it could help him when he appeared in court. Although the defendant did not provide the name of the supplier to the police, he moved to suppress statements he made to officers on the basis that they were elicited by improper inducements. The court found that the officer's comment that the revealing of the defendant's source might possibly help him when he appeared in court did not warrant an overturning of the district court's finding that the defendant's statement was voluntarily made. *Thomas* is similar to the instant case in that the interrogating officer in *Thomas* said there was a *possibility* that revealing the source might help the defendant, and here, the interrogating officer said that the defendant's cooperation would *probably* be taken into consideration as to how many cases were filed. In both cases the interrogating officers did not have authority to help the defendant, and neither officer made a promise of assistance, but speculated as to the effect of the defendant's cooperation.

In *State v. Porter*, 235 Neb. 476, 455 N.W.2d 787 (1990), the primary interrogator told the defendant that it could help him if he confessed and that it would look better for him if he confessed. At one point the interrogator said that he was *sure* the judge would take that into consideration. The court held that the interrogator's statements constituted implied promises of leniency which rendered the defendant's confession involuntary. *Porter* is distinguishable from the case at bar in that the interrogator was sure that a statement would be taken into consideration, whereas in the case at bar the officer referred only to a *probability* of a reduction in the number of

cases filed.

Coercive police conduct is a necessary predicate to the finding that a confession is not voluntary within the meaning of the due process clause of the 14th amendment. *State v. Hankins*, 232 Neb. 608, 441 N.W.2d 854 (1989). There is no evidence of coercive police conduct in the present case.

After considering the age, education, experience, and mental capabilities of the defendant, and the nature and extent of the interrogation, we conclude that the trial court was not clearly wrong in concluding that the confession given by the defendant was the product of his rational and voluntary decision and that the officer's rather innocuous statement that his report would indicate that defendant talked freely, which *probably* would be taken into consideration on how many cases were filed against him, did not coerce or overbear the defendant's free will.

We deal next with defendant's claim that the sentences imposed were excessive. Robbery is a Class II felony according to Neb. Rev. Stat. § 28-324 (Reissue 1989), which authorizes a maximum sentence of imprisonment of 50 years and a minimum sentence of 1 year. Attempted robbery is a Class III felony with a prescribed sentence of not more than 20 years nor less than 1 year. The sentences on the six robbery counts were respectively 5 to 10 years, 7 to 15 years, 9 to 20 years, 11 to 25 years, 15 to 50 years, and 15 to 50 years and on the attempted robbery, 6 to 15 years, with all sentences to run consecutively to each other. As earlier stated, these amounted to a total sentence of a minimum of 68 and a maximum of 185 years. The sentences imposed were within the statutorily prescribed limits.

As a general rule, a sentence imposed within the limits prescribed by statute will not be set aside as excessive absent an abuse of discretion. *State v. Nevels*, 235 Neb. 39, 453 N.W.2d 579 (1990). It is also within the trial court's discretion to direct that sentences imposed for separate crimes be served consecutively. *State v. Zaritz*, 235 Neb. 599, 456 N.W.2d 479 (1990).

In imposing a sentence, a sentencing judge should consider the defendant's age, mentality, education, experience, and social and cultural background, as well as his or her past criminal record or law-abiding conduct, motivation for the

offense, nature of the offense, and the amount of violence involved in the commission of the crime. *State v. Nevels, supra.* "Moreover, it is the minimum portion of an indeterminate sentence which measures its severity." *Nevels, supra* at 53, 453 N.W.2d at 588. Thus the important prong of the sentence is the minimum sentence of 68 years. In light of the defendant's age and insignificant prior criminal record, it is relevant to note that a sentence of imprisonment ought not exceed the minimum period consistent with protection of the public, gravity of the offense, and rehabilitative needs of the defendant. See *State v. Sturm,* 189 Neb. 299, 202 N.W.2d 381 (1972). Also, it is important to consider the rehabilitative needs of the defendant in sentencing, such as his or her addiction to narcotic drugs. One of the primary functions of the criminal law is to protect individuals and society from the depredations of the criminally bent. *State v. Etchison,* 188 Neb. 134, 195 N.W.2d 498 (1972).

It is difficult to color-match cases when reviewing the terms of sentences. Nevertheless, it is helpful to examine cases in which this court has reduced sentences.

In *State v. Sturm, supra,* the defendant, although admittedly abused by her husband, nevertheless waited until after he went to bed and had fallen asleep, and then she got a 12-gauge shotgun, loaded it with two shells, walked upstairs and into her husband's bedroom, and fired a shot at him from a distance of 8 feet. When he bolted upright, she shot him again.

As stated in the dissenting opinion, in which two other justices joined, the county attorney saw fit only to charge the defendant with second degree murder. The jury saw fit to convict the defendant of manslaughter.

The penalty for manslaughter at that time was imprisonment for not less than 1 nor more than 10 years. The trial court imposed a flat sentence of 10 years, which in effect was 1 to 10 years. This court, although commenting on the lapse of time between the alleged violence against the defendant by her husband and the fact that she waited until he had gone to sleep before shooting him, also pointed to mitigating circumstances including the husband's prior brutality and the defendant's great emotional disturbance, and found the sentence to be excessive. The court reduced the sentence to 5 years, which

amounted to imprisonment for not less than 1 nor more than 5 years. The court further commented, "A sentence to imprisonment ought not exceed the minimum period consistent with protection of the public, gravity of the offense, and rehabilitative needs of the defendant." *State v. Sturm, supra* at 302, 202 N.W.2d at 382.

In *State v. Foutch*, 196 Neb. 644, 244 N.W.2d 291 (1976), the court reduced defendant's sentence of 3 to 9 years' imprisonment for assault with intent to inflict great bodily injury on a 4-year-old child to 1 to 3 years. The defendant, the boyfriend of the child's mother for a period of 1 year, kicked the child for disobedience. As a result of the kick the child fractured his leg when either an electric fan fell on him or he was kicked into the fan. The court noted that defendant was 26 years of age with no prior record and that he did not represent a threat to the community.

*State v. Burkhardt*, 194 Neb. 265, 231 N.W.2d 354 (1975), involved a sentence of imprisonment of from 2 to 6 years for grand larceny which was reduced to a term of 1 to 3 years. The defendant's accomplice received 2 years' probation. The defendant was 19 years of age, his accomplice 18 years old, and neither had a prior felony record, but both had juvenile records. The defendant, unlike his accomplice, had a history of drug use.

The defendant in *State v. Stuggett*, 200 Neb. 693, 264 N.W.2d 876 (1978), had been sentenced to a term of imprisonment of 30 years for second degree murder, which was reduced by this court to 15 years. The conviction arose out of a fight in which the victim struck the defendant, who then retaliated by stabbing the victim in the chest three times. The court found the murder, although serious, was unplanned and provoked by the victim. The court concluded that the reduction of the sentence from 30 years to 15 years was consistent with protection of the public, gravity of the offense, and rehabilitative needs of the defendant.

This court has no Ouija board, nor do we possess any degree of prescience beyond that of sentencing judges. However, we do have the benefit of examination of sentences from many courts throughout this state for a variety of crimes and under diverse

circumstances, in which no opinions are written or published. Realizing, as we have stated, that a sentence ought not be longer than is necessary for rehabilitation and protection of society and that it is the minimum portion of an indeterminate sentence which measures its severity, we find that the minimum term of 68 years is substantially more than is necessary for rehabilitative purposes, is an obstacle so as to discourage the defendant from attempting rehabilitation, and is more than is necessary for the protection of society. To that extent the sentences constitute an abuse of discretion.

Based on the foregoing facts, law, and reasoning, we modify the judgment of the district court to provide that the defendant shall be sentenced to serve terms of imprisonment in an institution under the control of the Department of Correctional Services of 5 to 10 years on each of counts I, II, III, and IV, to be served consecutively to each other; of 5 to 25 years on each of counts V and VI, to be served concurrently with each other, but consecutively to the sentences on counts I, II, III, and IV; and of 5 to 15 years on count VII, to be served consecutively to the sentences on counts I to VI. This reduces the total of the sentences to a term of not less than 30 nor more than 80 years.

The judgment of the district court, as so modified, is affirmed.

AFFIRMED AS MODIFIED.

SHANAHAN, J., concurring.

Concerning voluntariness necessary for constitutional admissibility of a criminal defendant's confession or inculpatory statement, the U.S. Supreme Court observed in *Culombe v. Connecticut*, 367 U.S. 568, 602, 81 S. Ct. 1860, 6 L. Ed. 2d 1037 (1961):

> The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.

Accord, *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973); *State v. Bodtke*, 219 Neb. 504, 363 N.W.2d 917 (1985). Also, as expressed in *Miller v. Fenton*, 474 U.S. 104, 109-10, 106 S. Ct. 445, 88 L. Ed. 2d 405 (1985):

> This Court has long held that certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment. . . . Although these decisions framed the legal inquiry in a variety of different ways, usually through the "convenient shorthand" of asking whether the confession was "involuntary," *Blackburn v. Alabama*, 361 U.S. 199, 207 [80 S. Ct. 274, 4 L. Ed. 2d 242] (1960), the Court's analysis has consistently been animated by the view that "ours is an accusatorial and not an inquisitorial system," *Rogers v. Richmond*, 365 U.S. 534, 541 [81 S. Ct. 735, 5 L. Ed. 2d 760] (1961), and that, accordingly, tactics for eliciting inculpatory statements must fall within the broad constitutional boundaries imposed by the Fourteenth Amendment's guarantee of fundamental fairness.

Since the other members of this court have expressed dichotomous opinions regarding constitutional admissibility of Haynie's statements, the record in Haynie's case seems to be a good starting point for any analysis.

Before Haynie's arrest, Omaha police had been investigating a series of 13 robberies during the fall of 1989. Police reports on those robberies contained eyewitnesses' meticulous descriptions of the robber, who "had a red [bloodshot] eye and used the same type of cover over his hand [for concealment of a weapon] to do the robberies . . . ." Witness accounts supplied a "[p]hysical description of [the robber], his height, and his weight and age." When Haynie was brought to the police station for interrogation, the interrogating officer administered the *Miranda* warning or admonition and, at commencement of the interview, said that "[Haynie] was the one responsible for [the robberies], given the physical description of the suspect and the red eye of the suspect, which [Haynie] had at that time." The

officer proceeded to interrogate Haynie and, in the course of the interrogation, told Haynie that the officer "would make a report and indicate that [Haynie] talked to us freely, without any hesitation, and that would probably be taken into consideration on how many cases they filed on him." The interrogating officer expressly denied telling Haynie that "it would go easier on him if he cooperated" and also denied stating that "if [Haynie] cooperated . . . there might be less charges filed against him." In the course of the interrogation, Haynie admitted committing at least 11 robberies which had been investigated by Omaha police. Seven of those investigated robberies were the bases for charges on which Haynie was eventually tried and convicted. Haynie offered no evidence on voluntariness of his statements made during the interrogation. Among its conclusions, the district court found that Haynie's inculpatory statements were voluntary and, consequently, were admissible evidence on the question of Haynie's guilt for the robberies charged.

Regarding requisite voluntariness for constitutional admissibility of a defendant's statement, LaFave and Israel have observed:

> Viewing the voluntariness test in terms of its underlying values, then, it may be said that the objective of the test is to bar admission of those confessions (i) which are of doubtful reliability because of the practices used to obtain them; (ii) which were obtained by offensive police practices even if reliability is not in question (for example, where there is strong corroborating evidence); or (iii) which were obtained under circumstances in which the defendant's free choice was significantly impaired, even if the police did not resort to offensive practices.

1 W. LaFave & J. Israel, Criminal Procedure § 6.2 at 444 (West 1984).

That brings us to an examination of *Bram v. United States*, 168 U.S. 532, 18 S. Ct. 183, 42 L. Ed. 568 (1897), and its per se rule that a defendant's confession or inculpatory statement obtained by any direct or implied promise, however slight, vitiates voluntariness of the confession or statement, which is, therefore, rendered constitutionally inadmissible. Thus, *Bram*

reflects the necessity that a confession or statement must not be the result of a police promise or inducement to the defendant. Nevertheless, for quite some time, permissible police conduct in obtaining a defendant's confession or inculpatory statement has been evaluated through "an examination of all the attendant circumstances," see *Haynes v. Washington*, 373 U.S. 503, 513, 83 S. Ct. 1336, 10 L. Ed. 2d 513 (1963), or, as noted by LaFave and Israel:

> Under the Fourteenth Amendment due process voluntariness test, the Supreme Court has undertaken over the years a continuing re-evaluation on the facts of each case of how much pressure is constitutionally permissible in obtaining a confession. This rule, then, requires examination of the "totality of circumstances" surrounding each confession. As a general matter, this means that it is necessary to assess carefully the characteristics and status of the person who gave the confession and also the conduct of the police in obtaining it. This is not to suggest, however, that the Court has deemed it necessary to follow this approach in all cases. If the conduct of the police was "inherently coercive," then suppression in the interest of deterring such conduct in future cases is appropriate without first making any judgment about the impact of that conduct upon the particular defendant. But when the question comes down to whether *this* defendant's free choice was substantially impaired, then any facts which tend to show that he is more or less susceptible to pressures than the average person are particularly relevant.

(Emphasis in original.) 1 W. LaFave & J. Israel, *supra* at 444.

In *People v Conte*, 421 Mich. 704, 365 N.W.2d 648 (1985), the Supreme Court of Michigan considered the issue whether a defendant's inculpatory statement is inadmissible if induced by a law enforcement officer's promise of leniency and adopted a test which is "more consonant with the law and logic," namely:

> [A] statement induced by a law enforcement official's promise of leniency is involuntary and inadmissible, if there was a promise of leniency and that promise caused the defendant to confess. In determining whether a

promise of leniency exists, the relevant inquiry is whether the defendant reasonably understood the official's statements to be a promise of leniency. In determining whether that promise caused the defendant to confess, we will ask whether the promise was one relied upon by the defendant in making his decision to offer inculpatory statements, and whether it was one that prompted him in fact to give those statements. If the answer to all of the foregoing inquiries is affirmative, the defendant's statements are involuntary and inadmissible. If the answer to any of the questions is negative, the defendant's statements are admissible.

421 Mich. at 712, 365 N.W.2d at 650.

In *Conte*, the court noted:

Most authorities acknowledge that promises of leniency can render a confession involuntary and inadmissible. . . . The real question is under what circumstances will a promise of leniency render a confession involuntary. More particularly, the issue is whether, in determining the voluntariness of a confession, a promise of leniency is merely one of many factors to consider . . . or, whether a promise of leniency which alone induces a confession is sufficient to render the confession involuntary.

421 Mich. at 724-25, 365 N.W.2d at 655-56. Continuing in *Conte*, the court adopted a test which

comports with both the law of confessions and the law specifically relating to confessions induced by a promise of leniency. That test embodies elements of both the per se rule and the totality rule and holds that a confession induced by a law enforcement official's promise of leniency is involuntary and inadmissible.

. . . [T]he next question is what are the parameters of that rule. In applying the rule, we must first determine whether a promise of leniency exists, and, second, whether the promise caused the confession.

In determining whether the communication from the authorities to the defendant is sufficient to constitute a promise of leniency, we will focus upon defendant's state

of mind. Thus, it is from defendant's perspective that we will view the alleged promises. [Citations omitted.] The inquiry will be whether the defendant is likely to have reasonably understood the statements in question to be promises of leniency. [Citations omitted.]

Such an inquiry will necessarily depend upon the facts and circumstances in which the language is used. [Citations omitted.] Nonetheless, we wish to emphasize that mere adjurations or exhortations to tell the truth, without more, are insufficient to vitiate the voluntariness of a confession. [Citations omitted.] Such adjurations and exhortations are simply not promises. However, admonitions to tell the truth, coupled with other factors which could lead the defendant to believe that it is in his best interest to cooperate may amount to a promise of leniency. In addition, the promise need not be express, as subtle intimations can convey as much as express statements. . . .

If from the above inquiry we determine that no promise of leniency was made, then we will pursue the matter no further. If, however, we conclude that a promise of leniency was in fact made, then we will proceed to ask whether that promise causally induced the defendant's confession.

As in determining whether a promise exists, we will focus upon the defendant's state of mind to determine if that promise caused him to confess. [Citations omitted.] The promise, however, must have more than an attenuated causal connection with the confession, but need not be the only or even principal motivating factor. Rather, the promise must have been one relied upon by the defendant in making his decision and one that at least in part prompted the defendant to confess. [Citations omitted.]

421 Mich. at 739-41, 365 N.W.2d at 662-63.

Applying the *Conte* test to Haynie's case, the district court could well have concluded that (1) there was no promise of leniency to Haynie or other inducement for his inculpatory statements, or (2) if there was a promise of leniency or an

inducement, Haynie's statements were not the result of any promise or inducement; rather, the statements resulted from Haynie's realization that extensive police investigation into the robberies produced a substantial case against him and would likely culminate in his convictions for the robberies. In view of the record, neither of the foregoing conclusions is clearly erroneous; hence, the trial court's ruling on constitutional admissibility of evidence in Haynie's case is sustainable and must be affirmed, because the trial court's ruling is not clearly erroneous. See, *State v. Lamb*, 213 Neb. 498, 330 N.W.2d 462 (1983); *State v. Williams*, 205 Neb. 56, 287 N.W.2d 18 (1979).

Research indicates that no appellate court, state or federal, has held that an involuntary confession is constitutionally admissible in a criminal trial; rather, as expressed in *Jackson v. Denno*, 378 U.S. 368, 376, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964): "It is now axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession." Even in *Arizona v. Fulminante*, _____ U.S. _____, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991), which is the U.S. Supreme Court's most recent decision involving voluntariness of a confession, the Court commenced its analysis based on the premise that a defendant's involuntary confession is constitutionally inadmissible. At issue in *Fulminante* was whether the erroneous admission of an involuntary confession may be considered under the harmless error standard. Therefore, a discussion about personal freedoms, which may be more restricted as a result of the Supreme Court's construction of the U.S. Constitution vis-a-vis perhaps less restricted personal freedoms under the Nebraska Constitution construed by this court, is premature and, therefore, unnecessary in Haynie's case.

The central question in Haynie's case is the voluntariness of his inculpatory statements. Whether Haynie's statements were voluntary was a matter initially for the trial court's determination based on the facts presented and eventually for this court's evaluation in light of the trial court's findings and conclusions, which are not clearly erroneous. Consequently, the decision of the trial court must be affirmed.

WHITE, J., dissenting.

For nearly 100 years the U.S. Supreme Court construed the fifth amendment as rendering inadmissible confessions " 'extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight . . . .' " *Bram v. United States*, 168 U.S. 532, 542-43, 18 S. Ct. 183, 42 L. Ed. 568 (1897); *Hutto v. Ross*, 429 U.S. 28, 97 S. Ct. 202, 50 L. Ed. 2d 194 (1976). The decisions of this court were in accord. See, *State v. Hall*, 237 Neb. 169, 465 N.W.2d 150 (1991); *State v. Mayhew*, 216 Neb. 761, 346 N.W.2d 236 (1984), citing *Bram, supra*.

In *Arizona v. Fulminante*, _____ U.S. _____, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991), the Supreme Court summarily discarded *Bram* as no longer stating the standard for determining the voluntariness of a confession. In its place the Supreme Court adopted the "totality-of-the-circumstances" approach relied upon by this court today.

This court has in the recent past implicitly concluded that the opinions of the U.S. Supreme Court define for both the federal Constitution and our own state Constitution the extent of the protections afforded persons accused of crime. After reaching its high water mark in such landmark cases as *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), *Jackson v. Denno*, 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964), *Aguilar v. Texas*, 378 U.S. 108, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964), and *Delaware v. Prouse*, 440 U.S. 648, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979), the Supreme Court has retreated from those positions, sometimes steadily, sometimes precipitously.

As I am unable to agree that today's holding is either sound constitutional doctrine or a desirable social policy, I abandon my previous limited adherence to the primacy of the U.S. Supreme Court in defining state constitutional rights and dissent.

In *State v. Favero*, 213 Neb. 718, 724, 331 N.W.2d 259, 263 (1983), I wrote:

> It may well be necessary, in view of the decisions of the U.S. Supreme Court which have considerably weakened the once absolute strictures of *Miranda*, for this Court to . . . formulate, as have a number of the states, a state

constitutional basis to deal with police conduct violative of *Miranda.*

See, also, *State v. Arnold*, 214 Neb. 769, 336 N.W.2d 97 (1983) (White, J., concurring) (addressing the same concerns for search and seizure cases). That day is here. Since the decision in *Favero*, the U.S. Supreme Court has continued to modify many of its prior decisions in the fourth, fifth, and sixth amendment contexts, severely limiting the protections afforded persons accused of crimes.

In the fourth amendment area, the Court has relaxed the requirements for the issuance of a search warrant based on an informant's tip to the police. At one time an officer seeking a warrant based on such information had to show some factual basis for the informant's knowledge, as well as facts establishing either the veracity of the informant or the reliability of the information in a particular case. See, *Aguilar v. Texas, supra*; *Spinelli v. United States*, 393 U.S. 410, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969). The Court abandoned this two-prong test, however, in *Illinois v. Gates*, 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983). Today, decisions whether probable cause exists to support issuance of a search warrant are based on a "totality-of-the-circumstances" approach. *Gates, supra* at 462 U.S. at 230. Though the approach is designed to remove unnecessary impediments to effective law enforcement, Justice White warned that the Court's new approach threatens to eviscerate the traditional probable cause standard. *Gates, supra* (White, J., concurring).

The Court has also significantly enhanced the power of the police to search automobiles without a warrant. In 1925, the Court held that a warrantless search of an automobile requires probable cause that evidence is contained therein and that exigent circumstances make it unlikely that the car or the evidence will still be available when a warrant is obtained. See *Carroll v. United States*, 267 U.S. 132, 45 S. Ct. 280, 69 L. Ed. 543 (1925). Later, the Court engrafted an exception to the *Carroll* rule, allowing admission of evidence discovered during an inventory search of an automobile impounded for overtime parking to protect the owner's property. See *South Dakota v. Opperman*, 428 U.S. 364, 96 S. Ct. 3092, 49 L. Ed. 2d 1000

(1976). Finally, in *Colorado v. Bertine*, 479 U.S. 367, 107 S. Ct. 738, 93 L. Ed. 2d 739 (1987), the Court extended *Opperman* to allow inventory searches of closed containers in impounded vehicles. So long as the search is conducted pursuant to standing police regulations and is not undertaken solely to discover evidence, the search is valid even if the owner is available, there is no threat of loss of the property, and there is no probable cause that incriminating evidence is located in the car. *Bertine, supra.*

The Court has also retreated from the rule that even minimally intrusive "stop and frisk" activities require at least an articulable suspicion that the subject is engaged in illegality. See *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). In *Delaware v. Prouse*, 440 U.S. 648, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979), the Court held unconstitutional the random stopping of automobiles to check for valid operator's licenses. However, 11 years later the Court upheld the use of fixed checkpoints to check the sobriety of each driver passing through. See *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444, 110 S. Ct. 2481, 110 L. Ed. 2d 412 (1990). The *Sitz* Court reasoned that the magnitude of the drunk driving problem and the minimal intrusion on motorists' privacy justified departure from the articulable suspicion standard.

The balancing approach adopted by the *Sitz* Court has appeared in several other cases broadening the power of the police to engage in warrantless searches. See, *Treasury Employees v. Von Raab*, 489 U.S. 656, 109 S. Ct. 1384, 103 L. Ed. 2d 685 (1989) (suspicionless drug testing of Customs Service employees involved in drug interdiction activities or who carry a weapon is valid given compelling government interests involved); *Skinner v. Railway Labor Executives' Assn.*, 489 U.S. 602, 109 S. Ct. 1402, 103 L. Ed. 2d 639 (1989) (mandatory drug testing of railroad employees involved in certain accidents permissible under balancing approach); *Illinois v. Rodriguez*, _____ U.S. _____, 110 S. Ct. 2793, 111 L. Ed. 2d 148 (1990) (warrantless entry based on consent of third party whom police reasonably believe to possess common authority over the premises is valid, even if that person in fact lacks such authority).

The Court's move toward limiting the protections afforded persons accused of crime is not limited to the search and seizure area. Fifth and sixth amendment protections are eroding as well. A defendant's sixth amendment right to counsel is violated when the police "deliberately elicit" incriminating statements in the absence of an attorney. *Massiah v. United States*, 377 U.S. 201, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964). In *United States v. Henry*, 447 U.S. 264, 100 S. Ct. 2183, 65 L. Ed. 2d 115 (1980), the Court reversed a conviction based in part on statements made to an informant paid by the police to listen for inculpatory remarks. Though the informant in *Henry* complied with strict instructions not to question the defendant regarding the charged crime, the Court nevertheless found that the informant deliberately elicited the statements by initiating casual conversation with the defendant. In *Kuhlmann v. Wilson*, 477 U.S. 436, 106 S. Ct. 2616, 91 L. Ed. 2d 364 (1986), however, the Court unnecessarily reached out to decide that statements made to an informant placed in close proximity to the defendant, but who makes no effort to stimulate conversation, are admissible.

In the fifth amendment context, the Court, in the landmark case of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), held that the giving of specific warnings and a valid waiver are prerequisites to the admissibility of statements made by an accused while in custody. The Court has chipped away at this protection as well. Statements obtained in violation of a defendant's *Miranda* rights are now admissible to impeach the defendant's direct examination testimony as to matters directly related to guilt or innocence. See *Harris v. New York*, 401 U.S. 222, 91 S. Ct. 643, 28 L. Ed. 2d 1 (1971). The Court went even further in *United States v. Havens*, 446 U.S. 620, 100 S. Ct. 1912, 64 L. Ed. 2d 559 (1980), allowing the use of illegally obtained evidence to impeach statements made for the first time by the defendant on cross-examination. In dissent, Justice Brennan noted the severe impact of these decisions on the defendant's fifth amendment right to an unfettered decision as to whether to testify on his own behalf. *Havens, supra* (Brennan, J., dissenting).

The Court also long took the position that any conviction

based in whole or in part on an involuntary confession was invalid. See *Jackson v. Denno*, 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964). The Court specifically rejected as an "impermissible doctrine" the suggestion that admission of a coerced confession could be harmless error. See *Lynumn v. Illinois*, 372 U.S. 528, 537, 83 S. Ct. 917, 9 L. Ed. 2d 922 (1963). The Court based this unbending rule on the highly probative nature of confessions and on juror inability to comply with directions to ignore such evidence. See *Arizona v. Fulminante*, ____ U.S. ____, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991) (White, J., dissenting), citing *Cruz v. New York*, 481 U.S. 186, 107 S. Ct. 1714, 95 L. Ed. 2d 162 (1987) (White, J., dissenting); *Bruton v. United States*, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968) (White, J., dissenting). Nevertheless, the Court recently rejected *Lynumn* and held that harmless error analysis does apply to convictions based in part on admission of a coerced confession. See *Fulminante, supra*. See, also, *Colorado v. Connelly*, 479 U.S. 157, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986) (confessions resulting from mental or emotional condition which prevents the exercise of free will but which confessions are not the result of coercion are admissible).

The Nebraska Constitution guarantees its citizens the rights to due process of law and against compulsory self-incrimination. See Neb. Const. art. I, §§ 3 and 12. It is time for this court to decide whether these provisions afford persons accused of crime greater protection from the use of coerced confessions than does the federal Constitution. In my view, we should interpret the Nebraska Constitution as continuing to require the exclusion of confessions obtained by any direct or implied promises, however slight. Contrary to the majority's assertions, under our prior cases using this standard, the trial court erred in admitting Haynie's confession in this case.

In *State v. Porter*, 235 Neb. 476, 455 N.W.2d 787 (1990), this court reversed the conviction of a defendant who confessed to the crimes charged only after a police officer told him that it could help him if he confessed and that it would look better for him if he did confess. The court held that the officer's statements constituted an implied promise of leniency rendering the confession involuntary as a matter of law and

therefore inadmissible.

Here, the officer who interrogated Haynie admitted telling Haynie that he would make a report indicating Haynie's cooperation and that the report would probably be taken into consideration in determining the number of cases filed against him. As in *Porter*, the officer's statements were an implied promise of leniency rendering Haynie's subsequent confession involuntary as a matter of law.

The majority attempts to distinguish *Porter* by noting that there the interrogator told the defendant he was sure the judge would take the defendant's cooperation into consideration. However, neither in that case nor in this case did the interrogator promise that the defendant's cooperation would definitely help him. In both cases the police held out the possibility that a judge or prosecuting attorney might respond favorably if informed of the defendant's cooperation as an inducement to making a statement. It is this implied promise of leniency which we held impermissible in *Porter*.

*State v. Thomas*, 232 Neb. 490, 441 N.W.2d 186 (1989), is similarly unavailing as support for the majority's decision. In that case the police interrogator did not promise to voluntarily report the defendant's cooperation, but only speculated as to the effect of such knowledge if the court became aware of it. The majority in the present case errs in focusing on the interrogator's musings as to the effect of his report on the prosecuting attorney. The improper inducement occurred, however, when the interrogator definitely promised to include in his report that Haynie talked freely, without any hesitation. The discretionary inclusion of such editorial comments, *combined with* speculation as to their effect on the court, certainly constitutes at least "slight" inducement to make a statement. Because the trial court erred as a matter of law in admitting Haynie's confession, this cause should be remanded for a new trial.

I also point out that in announcing its "totality-of-the-circumstances" test, the majority lists a number of "potentially material considerations" for the trial judge to address. Because we have never before indicated that such considerations are relevant when a confession is induced, the

the trial court in this case did not assess the voluntariness of Haynie's confession in light of these factors. Such an assessment involves factual determinations which this court is not competent to make on appeal. Therefore, in any event, this cause should be remanded to the trial court for a determination of the voluntariness of Haynie's confession under the court's new test.