IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. GALVAN

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

AARON GALVAN, APPELLANT.

Filed February 16, 2021.    No. A-20-418.

Appeal from the District Court for Lancaster County: KEVIN R. MCMANAMAN, Judge. Affirmed.

Joseph D. Nigro, Lancaster County Public Defender, and Todd C. Molver for appellant.

Douglas J. Peterson, Attorney General, and Nathan A. Liss for appellee.

RIEDMANN, BISHOP, and WELCH, Judges.

RIEDMANN, Judge.

## INTRODUCTION

Aaron Galvan was convicted of one count of assault by a confined person in the district court for Lancaster County. He received a sentence of 32 months' imprisonment and 9 months' postrelease supervision. Galvan appeals, alleging insufficiency of the evidence for his conviction, imposition of an excessive sentence, and ineffective assistance of counsel. For the reasons set forth below, we affirm.

## BACKGROUND

*Initial Incident.*

On July 23, 2019, Galvan was incarcerated at the Nebraska State Penitentiary in Lincoln, Nebraska. At that time, Paul Larsen was a caseworker in Housing Unit 4. As Larsen attempted to make his way into "B Gallery," Galvan was attempting to leave B Gallery through the same door.

Galvan stated he needed to talk to the unit manager immediately, but Larsen stated Galvan did not have permission to do so without "a very good reason." Galvan and Larsen conversed for a short time and Larsen directed Galvan to go back into B Gallery and to shut the door. Galvan refused, propping the door open with his foot. According to Larsen, Galvan was growing increasingly "agitated and impatient" because he could not speak to the unit manager. Larsen testified that "[w]ithout using extreme force," he would not be able to shut the door due to Galvan's foot, so Larsen issued a holding call for Galvan. Larsen explained that a holding call was a request "for additional staff to come escort [Galvan] to restrain him with handcuffs behind his back and to have staff from the yard outside of the housing unit to come into the housing unit and escort him up to a holding cell."

While Galvan continued to refuse directives from Larsen, Galvan pushed past Larsen, stepping toward the stairs and out of the gallery, so Larsen attempted to block the stairway to contain Galvan. The pushing continued, taking the pair to the bottom of the stairs. Larsen explained he "was kind of getting pushed back a little bit and again when [Galvan] was reaching out with his arms and his hands, they ended up actually around my neck at one point basically choking me and I was struggling a little bit to breathe." Larsen put out a second radio call, this time for "staff assault."

Brock Juracek, a supervisory sergeant, and Muhammad Sallae, a gallery corporal, responded to the radio holding call. Juracek testified that when he arrived at the location of the call, he saw "Galvan's hands around Mr. Larsen's neck." Sallae also testified that when he arrived in the B Gallery stairwell, he saw "Galvan with both his hands on Caseworker Larsen's neck, you know, struggling." According to Sallae, "Caseworker Larsen was trying to -- he was giving him verbal commands to let go of him, which he wasn't," and Larsen was "coughing," leading Sallae to believe "[Larsen] was choking." Sallae testified Galvan looked "very aggressive, you know, agitated."

Both Juracek and Sallae attempted to pull Galvan and Larsen apart. Sallae testified that Galvan "attempted to come at me with his arm and that's when I just, you know try to restrain him." Sallae testified he used a "brachial stun" which he described as "a strike to [Galvan's] neck." According to Sallae, Galvan then released "Larsen and then he came at me with his right arm and attempted to, you know, kind of come at me with a choke, but I stopped that and I got both my hands around his torso and took -- escorted him to the ground by doing that." The officers eventually gained control and escorted Galvan out of the unit.

Larsen testified he had a bruise on his right arm that he believed came from being pushed up against the stairs and that his "body was a little sore, you know, so there was some pain." He also stated that the initial pain he felt was from Galvan trying to push past him in the doorway. He felt pain from the bruise and from struggling to breathe. Larsen testified he did not have any visible injuries on his neck. Juracek testified that after the incident, he did not observe any injuries on Larsen, Sallae, or Galvan.

Stacy Kraus, another correctional officer, estimated she was approximately 10 to 15 feet away from the encounter as it was happening, and she could see Galvan's thumbs pressing into Larsen's neck. However, on cross-examination, she admitted that when filling out an incident report, she did not indicate that Galvan choked Larsen.

Juracek wore a working body camera during the incident, although it was dislodged at some point during the commotion. Sallae and Juracek testified Housing Unit 4 did not have any cameras at that time.

*Overheard Statement.*

Investigator Ross Bartlett, a criminal investigator with the Nebraska Department of Correctional Services, began an investigation into the July 23, 2019, incident. He testified that on July 24, during his investigation he overheard Galvan say to another inmate that "the reason he was in restraints is because he was accused of choking staff." On redirect examination, Bartlett clarified that he heard Galvan say he was in restraints because "he choked staff." Bartlett testified he could not identify to which inmate Galvan was speaking "because there was a group of people there."

On October 3, 2019, Galvan was charged with two counts of assault by a confined person, Class IIIA felonies. Neb. Rev. Stat. § 28-932 (Reissue 2016). Count I was for the assault on Larsen; count II charged him with an assault on Sallae. Galvan pled not guilty to both charges. Following a jury trial, Galvan was found guilty on count I and not guilty on count II.

The court sentenced Galvan to 32 months' imprisonment followed by 9 months' postrelease supervision. Galvan appeals.

## ASSIGNMENTS OF ERROR

Galvan assigns that the district court erred by (1) accepting the jury verdict on count I and finding the evidence sufficient to convict him on that count, and (2) abusing its discretion by imposing an excessive sentence. He also asserts he received ineffective assistance of counsel in various ways.

## STANDARD OF REVIEW

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. McCurdy*, 301 Neb. 343, 918 N.W.2d 292 (2018).

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Archie*, 305 Neb. 835, 943 N.W.2d 252 (2020).

Appellate review of a claim of ineffective assistance of counsel is a mixed question of law and fact. When reviewing a claim of ineffective assistance of counsel, an appellate court reviews the factual findings of the lower court for clear error. *State v. Spang*, 302 Neb. 285, 923 N.W.2d 59 (2019). With regard to the questions of counsel's performance or prejudice to the defendant as part of the two-pronged test articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), an appellate court reviews such legal determinations independently of the lower court's decision. *State v. Spang, supra.*

ANALYSIS

*Sufficiency of Evidence.*

Galvan argues that the State failed to present sufficient evidence to convict him of assault by a confined person. He argues the State was unable to prove the elements of the crime and that witnesses were inconsistent in their testimony; therefore, a reasonable jury could not have found in the State's favor. We disagree.

Inconsistencies in a witness' testimony relate to a witness' credibility. *State v. Duckworth*, 29 Neb. App. 27, 950 N.W.2d 650 (2020). It is not in the purview of the appellate court to determine the credibility of witnesses on appeal, as such determinations are for the finder of fact. See *State v. Case*, 304 Neb. 829, 937 N.W.2d 216 (2020). Instead, the appellate court must determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt when viewing the evidence in the light most favorable to the State. *State v. Duckworth, supra*.

Galvan asserts that because of the inconsistencies in the testimonies presented, the evidence was insufficient for a reasonable jury to convict him of assault by a confined person. Galvan points out the testimonial inconsistencies as to which officers wore body cameras, which witnesses heard Galvan or Larsen speaking during the incident, and what Bartlett heard Galvan say to another inmate on July 24, 2019. However, it is not the role of an appellate court to resolve inconsistencies in the evidence; rather, it is that of the factfinder. Galvan highlighted these alleged inconsistencies in closing arguments; therefore, the jury had the opportunity to weigh the credibility of the witnesses against such inconsistencies. The jury found the witnesses for the State to be credible, and we will not disturb that finding.

Based on the evidence, we conclude that a reasonable jury could find the evidence sufficient to convict Galvan of assaulting Larsen. In relevant part, any person (a)(i) who is legally confined in a jail or an adult correctional or penal institution, (ii) who is otherwise in legal custody of the Department of Correctional Services and (b) who intentionally, knowingly, or recklessly causes bodily injury to another person has committed assault by a confined person. § 28-932. "Bodily injury" is defined as physical pain, illness, or any impairment of physical condition. Neb. Rev. Stat. § 28-109(4) (Reissue 2016).

Both parties stipulated at the start of the trial that on July 23, 2019, Galvan was in the legal custody of the Department of Correctional Services and was legally confined in an adult correctional or penal institution. As such, no dispute exists as to element (a)(i) or (a)(ii) of § 28-932.

Galvan argues the evidence was insufficient to prove Larsen suffered a bodily injury because there was no photographic evidence and no evidence of Galvan's causing any bodily injury to Larsen. However, physical manifestations of an injury are not required to meet the definition of "bodily injury." See § 28-109(4). The jury needed only to find that Galvan caused Larsen physical pain or impairment of a physical condition in order to satisfy the statutory definition of a bodily injury. See *id.*

Larsen testified he had no physical marks on his neck as a result of the incident. There were also no photographs taken to show any sign of physical injury to Larsen's neck. Nonetheless, Larsen did testify as to a bruise on his arm, although he could not remember on which arm the

bruise appeared. Larsen was able to say Galvan caused the bruise to appear, as "initially the pain [Larsen] felt was from [Galvan]." Larsen also testified as to soreness in his upper chest as a result of the incident. Moreover, Larsen testified that Galvan choked him and put pressure on his neck to the point that he was "struggling a little to breathe." When viewed in a light most favorable to the State, the evidence presented could lead a reasonable jury to find that Larsen suffered from physical pain or impairment of a physical condition (the ability to breathe); thus, evidence supports a finding that Galvan caused bodily injury as defined by § 28-109(4).

*Excessive Sentence.*

Galvan argues that the district court imposed an excessive sentence. We disagree.

Unless the trial court abused its discretion, an appellate court will not disturb an imposed sentence so long as the sentence is within the prescribed statutory limits. *State v. Chairez*, 302 Neb. 731, 924 N.W.2d 725 (2019). An abuse of discretion occurs when the sentencing court's reasons or rulings are clearly untenable and unfairly deprive the defendant of a substantial right and a just result. *State v. Oldenburg*, 10 Neb. App. 104, 628 N.W.2d 278 (2001).

The trial court must consider the defendant's age, mentality, education, experience, and social and cultural background, as well as his past criminal record or law-abiding conduct, motivation for the offense, the nature of the offense, and the amount of violence involved in the commission of the crime. *State v. Decker*, 261 Neb. 382, 622 N.W.2d 903 (2001). The court should also consider the rehabilitative needs of the defendant in sentencing, such as his addiction to narcotic drugs. *State v. Haynie*, 239 Neb. 478, 476 N.W.2d 905 (1991). Where a sentence imposed within statutory limits is alleged to be excessive, the appellate court must determine whether the sentencing court abused its discretion in considering and applying the aforementioned factors, as well as any applicable legal principles in determining the sentence to be imposed. *State v. Oldenburg, supra.*

Galvan was convicted of assault by a confined person, a Class IIIA felony, punishable by up to 3 years' imprisonment and 18 months of post-release supervision or a $10,000 fine or both. See Neb. Rev. Stat. §§ 28-932 and 28-105 (Reissue 2016). Galvan was sentenced to 32 months' imprisonment and 9 months' postrelease supervision. The court gave Galvan credit for 203 days' time served.

The district court utilized the presentence investigation report (PSR) created for Galvan as well as all the relevant factors for his sentencing. At the sentencing hearing, the district court stated that it took into account Galvan's age, mentality, education, past criminal record, motivation for and nature of the offense, the violence of the offense, and the PSR.

The PSR specified that Galvan refused to participate in the presentence investigation interview. However, the PSR includes Galvan's prior criminal history, an inmate classification study and current mental health diagnosis, programming recommendations and status of programming, misconduct reports, an inmate movement sheet, a case manager's comment and summary report, and substance abuse evaluations and/or treatments from the Department of Correctional Services.

Galvan's past criminal record includes two assault or threaten charges, disorderly conduct, an attempted burglary conviction, two third degree domestic assault convictions, violation of a protection order, larceny, disturbing the peace, assault of an officer with bodily fluid, shoplifting,

attempted possession of a controlled substance, and possession of a firearm by a prohibited person. While incarcerated, Galvan incurred multiple infractions, including swearing, two counts of obstructing a correctional officer, and flooding his cell.

Galvan completed seventh grade in school and eventually earned his GED in 2010 while incarcerated. He attended community college for a couple of months but stopped once he was arrested. He has held multiple jobs throughout his life, including at fast-food restaurants, construction, and working for a tree service. Otherwise, he was homeless for a 5-year period. He has no past medical history of mental health issues or the need for psychiatric evaluations. Galvan was emancipated at age 13 and is seemingly estranged from his mother and father, who never married each other. He has two daughters, ages 4 and 5, from a prior relationship and believed that in 2014 a former partner was pregnant with his child. In 2014, Galvan was behind on child support.

Galvan indicated he only drinks alcohol lightly and denies street drug use, although he admitted to a prior methamphetamine possession charge and a placement in drug court programming. The 2014 inmate classification study indicates Galvan would benefit from substance abuse programming and anger management programming. As of May 2020, Galvan had participated in one Alcoholics Anonymous meeting and two Bible studies while incarcerated.

The district court's sentencing order iterated a lesser sentence would depreciate the seriousness of the crime and would promote disrespect for the law. The court also detailed that the crime caused or threatened serious harm and that there was no reason to excuse or justify the offense since Galvan's actions were not provoked by the victim. Based on these statements, the district court clearly considered all required factors and the importance of protecting the public in its determination of Galvan's sentence. We find no abuse of discretion.

*Ineffective Assistance of Counsel.*

Galvan's third assignment of error is that he received ineffective assistance of counsel. He assigns that his trial counsel was ineffective because counsel failed to (1) depose witnesses as requested by Galvan and (2) request a *Jackson v. Denno* hearing.

Galvan's appellate counsel is different than his trial counsel. When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. *State v. Lierman*, 305 Neb. 289, 940 N.W.2d 529 (2020). Once raised, the appellate court will determine whether the record on appeal is sufficient to review the merits of the ineffective performance claims. *Id.*

In order to know whether the record is insufficient to address assertions on direct appeal that trial counsel was ineffective, appellate counsel must assign and argue deficiency with enough particularity (1) for an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) for a district court later reviewing a petition for postconviction relief to be able to recognize whether the claim was brought before the appellate court. *Id.* When a claim of ineffective assistance of trial counsel is raised in a direct appeal, the appellant is not required to allege prejudice; however, an appellant must make specific allegations of the conduct that he or she claims constitutes deficient performance by trial counsel. *Id.*

Generally, to prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show

that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Mrza*, 302 Neb. 931, 926 N.W.2d, 79 (2019). To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. *Id.* To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* There is a strong presumption that counsel acted reasonably, and an appellate court will not second-guess reasonable strategic decisions. *State v. Huston*, 285 Neb. 11, 824 N.W.2d 724 (2013).

### (a) Failure to Depose Witnesses

Galvan argues his trial counsel failed to "depose any witnesses as requested by [Galvan]," even though trial counsel "filed a motion to allow taking depositions of all endorsed witnesses." Brief for appellant at 34. The list of endorsed witnesses in the trial transcript includes 106 names. However, Galvan "is required to specifically allege what the testimony of these witnesses would have been, had they been called in order." See *State v. Hill*, 298 Neb. 675, 686, 905 N.W.2d 668, 699 (2018). Therefore, we find Galvan's lack of description insufficient to preserve this assigned error. As such, we need not address it further.

### (b) Failure to Request *Jackson v. Denno* Hearing

Galvan argues trial counsel's performance was deficient because counsel failed to request a *Jackson v. Denno*, 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964), hearing regarding the voluntariness of the comments Galvan made that were overheard by Bartlett.

A *Jackson v. Denno* hearing determines whether a defendant's confession was voluntary and therefore admissible. In order to be admissible a statement or confession must have been freely and voluntarily made, and must not have been extracted by any direct or implied promise or inducement, no matter how slight. *State v. Crisp*, 219 Neb. 265, 361 N.W.2d 544 (1985). The determination of whether a statement was freely and voluntarily made necessarily turns on the totality of circumstances in any particular case. *Id.*

Galvan alleges that because he was in custody at the time the statements were made, "any statement he made was custodial" and thus involuntary and inadmissible. Brief for appellant at 35. Custodial interrogation is "questioning *initiated by law enforcement officers* after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966) (emphasis supplied). Nothing in the record indicates that any of the corrections officers initiated questioning to illicit a response from Galvan or that he did not give his statement freely and voluntarily. As such, Galvan was not subject to custodial interrogation and a *Jackson v. Denno* hearing was unnecessary. Counsel cannot be ineffective for failing to raise a meritless argument. *State v. Schwaderer*, 296 Neb. 932, 898 N.W.2d 318 (2017).

### CONCLUSION

For the reasons stated above, we affirm Galvan's conviction and sentence.

AFFIRMED.