CLAYTON LAVERNE SHEPPERD, PLAINTIFF IN ERROR, v. STATE OF NEBRASKA, DEFENDANT IN ERROR.

96 N. W. 2d 261

Filed April 24, 1959. No. 34567.

*John R. Sullivan,* for plaintiff in error.

*Clarence S. Beck,* Attorney General, and *Homer L. Kyle,* for defendant in error.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

The plaintiff in error, Clayton LaVerne Shepperd, hereinafter referred to as defendant, was charged with the crime of assault with intent to commit rape. He was convicted and sentenced to be confined in the Nebraska State Reformatory. He brings the cause here by petition in error to seek to have the conviction and sentence vacated.

The defendant contends that the trial court committed prejudicial error in failing to quash the information, for the reason that a copy thereof had not been served upon the defendant or his counsel within 24 hours after the information was filed in the office of the clerk of the district court for Loup County.

Section 29-1802, R. R. S. 1943, provides: "The clerk of the district court shall, upon the filing of any indictment with him, and after the person indicted is in custody or let to bail, cause the same to be entered of record on the journal of the court; * * *. Within twenty-four hours after the filing of an indictment for felony, and in every other case on request, the clerk shall make and deliver to the sheriff, the defendant or his counsel a copy of the indictment, and the sheriff on receiving such copy shall serve the same upon the defendant. No one shall be, without his assent, arraigned or called on to answer to any indictment until one day shall have elapsed, after receiving in person or by counsel, or having an opportunity to receive a copy of such indictment as aforesaid."

Section 29-1602, R. R. S. 1943, provides in part: "All informations shall be filed in the court having jurisdiction of the offense specified therein, by the prosecuting attorney of the proper county as informant."

Section 29-1604, R. R. S. 1943, provides in part: "The provisions of the criminal code in relation to indict-

ments, and all other provisions of law, applying to prosecutions upon indictments to writs and process therein, and the issuing and service thereof, * * * shall in the same manner and to the same extent, as nearly as may be, apply to informations, and all prosecutions and proceedings thereon."

In the instant case the information was filed January 29, 1958, in the office of the clerk of the district court for Loup County. The defendant was served with a copy thereof on Saturday night, October 11, 1958.

At the beginning of the trial, the defendant objected to any testimony of the prosecutrix because of the failure of the State to serve upon the defendant a copy of the information within the time specified by statute. The court overruled the objection.

The defendant cites Bush v. State, 62 Neb. 128, 86 N. W. 1062, wherein the court held: "The state is required to furnish a defendant informed against for a felony with one copy, and no more, of the information filed against him, within twenty-four hours after such filing." To the same effect is Eigbrett v. State, 111 Neb. 388, 196 N. W. 700, and Hoctor v. State, 141 Neb. 329, 3 N. W. 2d 558.

On Monday morning, October 13, 1958, the defendant was arraigned in the district court. He was asked by the court if he had been served with a copy of the information, and replied that he had been served with a copy on Saturday night. The information was then read to him by the county attorney, and the defendant entered a plea of not guilty. The defendant was represented by counsel at that time.

The obvious purpose of section 29-1802, R. R. S. 1943, relative to service of a copy of an indictment or information, is to insure the defendant a reasonable time in which to prepare his defense. Why a copy of the information was not served upon the defendant until October 11, 1958, does not appear in the record. It does appear from the record, however, that the defendant

had been a member of the United States Air Force for 2 years and 4 months, and had been stationed at Las Vegas, Nevada. Perhaps these facts account for the delay in serving the information.

It is true that the defendant was not served with a copy of the information within 24 hours after it was filed, or, in fact, until several months thereafter. The question presented is, were the defendant's rights prejudiced thereby?

In Darlington v. State, 153 Neb. 274, 44 N. W. 2d 468, this court said: "There is no specified time that must elapse between filing of an information or indictment and the commencement of trial thereon, except defendant may not without his consent be arraigned or required to answer it until at least one day after he has received a copy thereof."

In the event the defendant was unable to prepare his defense, a proper remedy would have been for him to file a motion for continuance or postponement of the trial. No affidavits were filed or showing of any kind made by the defendant to indicate that any of his rights were prejudiced by the delay in serving a copy of the information on him.

"All presumptions exist in favor of regularity and correctness of orders and judgments of courts of general jurisdiction, and he who asserts the contrary is required to establish a claimed defect or error by an exhibition of the record." Darlington v. State, *supra*.

We find the defendant's assignment of error to be without merit.

The defendant predicates error on the failure of the trial court to sustain his motion to quash the information for the reason that it was defective in failing to allege all of the essential elements of the offense charged, and deprived the defendant of his constitutional and statutory rights.

The information charged, in part: "* * * that Clayton LaVerne Shepperd * * * did then and there felon-

iously assault Bertha Sarnowski a female child under age of 15 years, with the intent of him the said Clayton LaVerne Shepperd to commit a rape upon the said Bertha Sarnowski, * * *." It is the theory of the defense that this information was defective in that it does not specify that the defendant had the intent to "then and there" commit a rape.

Section 28-409, R. R. S. 1943, provides in part: "Whoever assaults another with intent to commit a murder, rape, sodomy or robbery upon the person so assaulted, shall be imprisoned in the penitentiary * * *." This is the section of the statutes under which the defendant was charged. It will be observed that the statute does not require that the assault must be accompanied by an intent to commit a rape "then and there." The language of the information substantially follows the language of the statute.

In Emery v. State, 138 Neb. 776, 295 N. W. 417, this court said: "It is generally sufficient in an information to describe the crime charged in the language of the statute * * *." See, also, Pandolfo v. State, 120 Neb. 616, 234 N. W. 483.

If the information informs the accused with reasonable certainty of the charge made against him it is sufficient. See May v. State, 153 Neb. 369, 44 N. W. 2d 636.

We conclude that the trial court did not err in overruling the defendant's motion to quash the information.

The record discloses that Bertha Sarnowski, hereafter referred to as Bertha or the prosecutrix, lived in Taylor, Nebraska, with her parents; and that she was 14 years of age on November 25, 1957. Early that evening she went to a show at Sargent, Nebraska, with the Andreesen family who were her neighbors and who employed her on occasions as a baby sitter. After the show they returned to Andreesen's at approximately 10 p.m. The Andreesens let Bertha out at their home and she walked to her home. There was a teen-age

dance in progress in Taylor, and Bertha obtained permission from her parents to attend. Her older sister Lois was presumed to be present at the dance, but apparently had left and returned home without the knowledge of the family. Bertha stayed at the dance until approximately 11 p.m. She left the dance with Barbara Brodine and Nadine Zalud, and left them at the end of the park and cut across toward an old cafe on the corner where she stood on the sidewalk near the crosswalk. A car drove up and stopped at the stop sign. This car was a few yards directly in front of Bertha. Someone in the car called and asked her where she was going. She replied that she was going home, and started to walk in that direction. The defendant got out of the car, and the car drove off. The defendant asked Bertha questions and told her that his name was Jerry Perkins, how old he was, and that he had been "kicked" out of school. He was endeavoring to get a date with her, but she told him she was too young to date, and would not date him anyway. After a short time the car came back and stopped in the middle of the street. The defendant opened the car door and his companions who were in the car tried to persuade Bertha to get into the car. She told them that she did not know their right names, and the defendant kept asking her to get in the car and told her that they would take her home. A young man by the name of Chilewski was driving. Bertha got in the car and sat in the middle of the front seat with Chilewski to her left and the defendant to her right. There were two other young men in the back seat of the car. Chilewski drove the car around town for a few minutes and went by her home. She asked to be let out, but the young men just laughed and drove on toward the highway and turned on the road to Almeria. The car was driven until they arrived at an irrigation ditch, which was about a mile from Taylor, and then turned on another road and stopped near a haystack. At this point three of the young men got

out of the car. The defendant stayed in the car with Bertha and began putting his hands under her clothes, telling her they were "all going to have" her that night, and if she would give in, they would take her back to town. She repeatedly asked him to take her back to town and let her alone. The defendant laughed and said he did not think that was the thing to do. He kept saying the reason they picked her up was so they could have what they wanted, and it would not make any difference, they would get what they wanted before the evening was over. After a while the three other young men returned and got into the car. They then drove on toward Almeria. Bertha kept asking them to take her home, and they refused.

Bertha further testified that the defendant put his arm around her and held her left arm down, and at that time Chilewski and the defendant put their hands under her dress. She struck them when she could, and begged them to stop, but they refused. Once when Chilewski put his hand under her dress he almost had to stop the car to keep it from running into a ditch. The car was stopped along the road several times. The young men started getting rough, and someone said something about taking her clothes off, and they started to do so. Chilewski told one of the boys in the back seat to hold her hand, and one of them took hold of her left arm and hung on. The defendant held her right arm. They unbuttoned her coat. She kept biting and scratching, and asking them to stop. When they had her coat unbuttoned, they pulled her arms out of the sleeves and dropped the coat in the back seat of the car. They then started to unbutton her dress. When they had her dress unbuttoned, they pulled it off her shoulders and down to her waist. Chilewski told one of the young men in the back seat to unfasten her "bra." He started to do so, but did not know how to loosen it. Bertha bit and scratched as she could during this action. The defendant got his hands in her "bra" and kept pinching

her. Chilewski decided to take her panties off; and the defendant held her arms so that she would be unable to resist. About that time Bertha noticed the headlights of a car approaching. Chilewski let go of her and started the car. Bertha opened the car door and tried to jump out. When the car was even with them she honked the horn and called for help, but the defendant pulled her back into the seat. The car went on by. Thereafter Chilewski drove up a side road and stopped. At that point Chilewski and the defendant kept putting their hands between her legs. She attempted to resist them. They became mad, started calling her vulgar and indecent names and said they were going to have intercourse with her that night, and that the defendant was to be the first one to accomplish the act. Three of the young men got out of the car, leaving the defendant and Bertha alone. The defendant started putting his hands under her clothing, holding her arms down, and trying to push her down in the seat, but he was unable to do so. He then asked her to get into the back seat with him, and she refused. Bertha further testified that she tried to "talk sense" to him and requested that he take her home as she did not want to cause her folks any trouble. Everything that she said, the defendant said was "beyond the point." Finally, Chilewski came back and opened the car door and said: "Get the hell out of there. I can make her." The defendant took out a package of cigarettes, and when he attempted to light one Bertha opened the door on the driver's side and jumped out. She ran up a bank beside the road and into a barbed wire fence. Before she got under the fence, Chilewski caught her and knocked her down. She took off her glasses and put them under the fence, then told Chilewski she had lost them. He called for the other boys to come and help look for the glasses. Bertha jumped up and ran down the bank behind the car. Chilewski caught up with her, twisted her arm behind her back, and shoved her against the car. She asked

the other boys to help her, and they just looked at her and got back in the car. Chilewski then endeavored to force her to do as he desired, and she twisted away from his grasp. He grabbed her dress, which was unbuttoned all the way down, and she twisted out of it and proceeded to run. After that she had on only a light taffeta half slip, her bra, and anklets. When Chilewski saw that he wouldn't be able to catch her, he returned to the car. She climbed a bank and started running across the hills. After a while she came to a farmhouse occupied by Mrs. Ethel Cook who invited her into the house and got her an old coat to put on. At Bertha's request, Mrs. Cook called the Andreesens and they in turn called Bertha's mother to the telephone. Finally, Bertha's father came and took her home.

Mrs. Ethel Cook testified that she lived about 11 miles from Taylor; that Bertha came to her house about 2 a.m., the morning of November 26, 1957; and that Bertha had on just a brassiere, a skirt, and anklets. She seemed very cold and frightened. She was shivering and trembling. Her anklets were full of sandburs when she took them off.

Bertha's mother testified that when Bertha was returned to her home that morning she was crying, her hair was "messed up," and she had a split lip. Later she had black and blue marks on her arm and between her legs.

A deputy sheriff investigated the complaint he received the morning of November 26, 1957. This witness, together with the county attorney, Bertha, and Bertha's parents drove to the place where the car had parked. They found one shoe and a pair of glasses belonging to Bertha. Continuing his investigation, he learned that the young men who occupied the car that night were George Chilewski, Marvin Amos, Kenneth Richardson, and the defendant. Later in the day this witness and the town marshal of Sargent contacted Amos, and he took them to a bridge on the highway about 3 miles

southeast of Milburn where Bertha's clothes were found. They were in a bundle and had been placed on a rafter under the bridge.

The defendant testified in his own behalf that he was 18 years old at the time of the commission of the alleged offense. He was married in May 1958. He then testified as to his position in the Air Force. He further testified that he knew George Chilewski, and that on the night in question Chilewski came to his house and they started to go to a dance in Loup City. After driving around to several places, the four young men arrived in Taylor at 10:45 or 10:50 p.m. They saw Bertha and several other girls standing on the opposite side of the park. The young men decided to drive around to where the girls were. When they arrived, the other girls had left and Bertha was alone. The defendant got out of the car and talked to Bertha. The others in the car left and returned in about 3 minutes. The defendant took hold of Bertha's elbow and helped her into the car.

The principal part of the defendant's testimony is a denial of any intention on his part to rape the prosecutrix. He denied, for the most part, the evidence of Bertha relating to such facts, but admitted that he was alone with her in the car at times. He testified that he did not believe that he made any statement to her that he was going to have intercourse with her.

On cross-examination the defendant testified that after Bertha had escaped he and one of the other boys walked up and down the road 200 or 300 yards each way, and the car was driven 4 or 5 miles, looking for her, but no one saw her. Chilewski finally said: "* * * let's go home and go to bed." The defendant testified that he placed her clothes on a rafter under a bridge.

Other testimony offered in behalf of the defendant related to his good reputation in the community in which he lived.

The defendant contends that the trial court committed prejudicial error by permitting the defendant to be

cross-examined as to matters foreign to the scope of his direct examination.

In this connection, the defendant asserts that when he finished his direct examination he had testified that the last time he saw Bertha she was on the trunk of Chilewski's car; that the defendant did not testify on direct examination to anything that happened after the last time he saw Bertha; and that the county attorney inquired of the defendant facts relating to what happened after the defendant last saw Bertha, that is, what he did to find her after she ran away and what he did next. The defendant's counsel objected to these questions on the grounds of improper cross-examination and going into facts not brought out on direct examination. These objections were overruled.

In Garcia v. State, 159 Neb. 571, 68 N. W. 2d 151, this court said: "The rule is that one charged with a crime, who becomes a witness in his own behalf upon his trial, is subject to the same rules that govern other witnesses upon cross-examination and may, on cross-examination, be interrogated as to matters brought out on direct examination." See, also, Grandsinger v. State, 161 Neb. 419, 73 N. W. 2d 632.

On direct examination the defendant testified to the events occurring on the night of November 25, 1957, up to the time that he saw Chilewski catch the prosecutrix when she tried to escape, and that the last time he saw her she was fully clothed and was on the trunk of Chilewski's car. On cross-examination, over objections of the defense counsel, the defendant testified that after the prosecutrix left, Chilewski brought her coat and dress back to the car. This testimony obviously related to the defendant's testimony on direct examination that the last time he saw the prosecutrix she was fully dressed. The defendant further testified on cross-examination that the young men in the party, including himself, made an effort to find the prosecutrix after she escaped and ran away from them, and that he was

given the clothing belonging to the prosecutrix and told to put it under the bridge, which he did. The purpose of this cross-examination was to at least contradict the defendant's testimony given by him on direct examination that he knew nothing about the disrobing of the prosecutrix.

There is a well-established rule that although a witness is permitted to be cross-examined as to matters not brought out on direct examination, the judgment will not be reversed when it appears that no prejudice could have resulted. See, Griffith v. State, 157 Neb. 448, 59 N. W. 2d 701; Brooks v. Thayer County, 126 Neb. 610, 254 N. W. 413; Manley State Bank v. Spangler, 130 Neb. 196, 264 N. W. 459.

We find no prejudicial error as contended for by the defendant.

The defendant contends that the trial court committed prejudicial error in refusing to dismiss the action or to direct a verdict of not guilty in favor of the defendant at the close of the State's evidence and at the conclusion of all of the evidence. Both of these motions were overruled.

The rule is: "Where assault with intent to commit rape is charged, the testimony of prosecutrix must be corroborated by facts and circumstances established by other competent evidence to justify conviction." Frank v. State, 150 Neb. 745, 35 N. W. 2d 816. See, also, Pew v. State, 164 Neb. 735, 83 N. W. 2d 377.

However, this court has held repeatedly, as stated in Hughes v. State, 154 Neb. 86, 46 N. W. 2d 904: "In a prosecution for assault with intent to commit rape, it is not essential to a conviction that the prosecutrix should be corroborated by the testimony of other witnesses as to the particular act constituting the offense. It is sufficient if she be corroborated as to material facts and circumstances which tend to support her testimony, and from which, together with her testimony as to the principal fact, the inference of guilt may be drawn." See,

also, Wheeler v. State, 106 Neb. 808, 184 N. W. 883; Beer v. State, 129 Neb. 366, 261 N. W. 824; Haynes v. State, 137 Neb. 69, 288 N. W. 382; Aller v. State, 114 Neb. 59, 205 N. W. 939; Frank v. State, *supra.*

Under these rules and in the light of the evidence above set forth, we find it ample to sustain the submission of the case to the jury on the crime charged. There is no merit to the defendant's contention that the verdict should be set aside because of insufficient evidence to sustain it.

The defendant predicates error on the part of the trial court in failing to give the defendant's requested instructions Nos. 3 and 5.

Requested instruction No. 3 reads as follows: "You are instructed that in order to find the defendant guilty of the crime charged here it is necessary for you to find, beyond a reasonable doubt, that the defendant had the intent to immediately have intercourse with Bertha Sarnowski and not to merely take liberties with her person; such mere familiarity in the absence of indecent and improper liberties coupled with the intent to immediately have intercourse does not constitute the crime charged."

Requested instruction No. 5 is a lengthy instruction which is much more detailed than instruction No. 3 and seeks to define assault with intent to commit rape and the lesser crime of assault and battery, and what the jury must find to convict the defendant.

Section 28-409, R. R. S. 1943, provides that the assault must be committed with the intent to commit rape, but it does not say the assault must be committed with the intent to "immediately" commit rape. Consequently, the tendered instruction contains an alleged element of the offense which is not found in the statute defining the crime and in such respect is erroneous.

The trial court, in instructions Nos. 5, 6, 9, and 10 fully and accurately instructed the jury on the points

sought to be covered by defendant's requested instructions Nos. 3 and 5.

In Danielson v. State, 155 Neb. 890, 54 N. W. 2d 56, this court held: "A trial court may properly refuse tendered instructions which are covered by instructions given on its own motion." See, also, May v. State, 155 Neb. 786, 54 N. W. 2d 62.

In Graham v. State, 90 Neb. 658, 134 N. W. 249, the court said: "Where the district court has by his instructions fully and correctly stated the law as it should be applied to the facts disclosed by the evidence in a criminal prosecution, he is not required to give further or additional instructions requested by the defendant."

We conclude that the trial court did not commit prejudicial error as contended for by the defendant.

The defendant predicates error on the part of the trial court in receiving into evidence certain articles of clothing worn by the prosecutrix at the time of the alleged assault, to which evidence the defendant objected.

The articles of clothing in question were identified by the prosecutrix as a coat, dress, a red half slip, a white half slip, panties, a handkerchief, and a purse. The defendant argues that this type of testimony should not have been admitted for the reason that the evidence discloses that the defendant had nothing to do with the removal of the clothing of the prosecutrix; that there is nothing to connect the defendant with the taking off of the clothing of the prosecutrix; that the prosecutrix testified that George Chilewski was the one who pulled her panties down and pulled her dress off; and that the only purpose of introducing these articles of clothing and accessories into evidence was to inflame the minds of the jurors.

The defendant cites Hughes v. State, *supra*, wherein it was held: "No force on the part of the defendant, or resistance on the part of the female, is essential to constitute the crime of rape, or of an assault with intent to commit that offense, when it is alleged and proved

that the female is under the statutory age of consent and the defendant is at least 18 years old."

The prosecutrix testified that these articles were removed from her body during the assault by the defendant and his companions. The defendant admitted that he and Chilewski were trying to unbutton the prosecutrix's dress when she was sitting in the front seat of the car between them. During the course of the ride her clothing was removed. We make reference to the evidence of the prosecutrix and of Mrs. Cook heretofore set out, and the evidence that one of the young men who was in the party took the police officers to a bridge over an irrigation ditch located about 3 miles southeast of Milburn, and showed the officers where the clothing which they had removed from the prosecutrix had been hidden under the bridge. The evidence discloses that the defendant put it there. The articles of clothing which were removed from the body of the prosecutrix, the testimony relating thereto, and the discovery of the clothing were circumstances which served to corroborate her testimony that the clothing was removed from her body.

In Frank v. State, *supra,* this court said: "It has long been the rule in this jurisdiction that: 'Where, in a prosecution for assault with intent to commit rape, prosecutrix testifies unequivocally to facts which would constitute the offense, a sufficient corroboration is shown if opportunity and inclination, on the part of the defendant, to commit the offense are shown, and the circumstances proved by other witnesses tend to corroborate the testimony of prosecutrix.' Aller v. State, 114 Neb. 59, 205 N. W. 939. See, also, Lewis v. State, 115 Neb. 659, 214 N. W. 302."

The defendant contends that the testimony shows that many of the articles removed from the body of the prosecutrix were removed by others in the party and not by the defendant, therefore, such evidence was inadmissible.

480

In 22 C. J. S., Criminal Law, § 777, p. 1328, it is said: "Where several persons participate in the actual commission of a crime, the acts and declarations of any one of them, while so participating, are admissible against all the others." See, also, Marshall v. State, 35 Ariz. 449, 280 P. 491; Hollingshead v. State, 21 Okl. Cr. 306, 207 P. 104, and other cases cited under note 72.

We conclude that the trial court did not commit prejudicial error as contended for by the defendant.

The judgment of the trial court should be, and is, affirmed.

AFFIRMED.