**WILLISTON EDUCATION
ASSOCIATION, Plaintiff
and Appellee,**

v.

**WILLISTON PUBLIC SCHOOL
DISTRICT NO. 1, Defendant
and Appellant.**

**Civ. No. 910264.**

Supreme Court of North Dakota.

April 6, 1992.

Paul W. Jacobson (argued), of Bjella, Neff Rathert, Wahl & Eiken, PC, Williston, for defendant and appellant.

Michael Geiermann (argued), of Chapman and Chapman, Bismarck, for plaintiff and appellee.

Gary R. Thune, of Pearce & Durick, Bismarck, for Amicus Curiae, North Dakota School Boards Ass'n.

MESCHKE, Justice.

The Williston Public School District No. 1 appeals a judgment that all of its high school teachers who taught six classes during the 1990–1991 term are contractually entitled to additional compensation for teaching an "extra class." We affirm.

Seeking to reduce the continued depletion of its reserves stemming from the depressed economy at Williston, the District asked a citizen's committee to recommend ways. One way recommended was to reduce minutes per class in the high school from fifty-five to fifty, and to increase the standard number of classes per day for each high school teacher from five to six. Teachers opposed the change, warning that it would "increase the teacher[s] workload," that it would sacrifice "quality teaching," and that it would cause a "loss of over three weeks of classroom instruction time per year." Despite this opposition, the District board, in February 1990, changed "the number of student contact periods at the Williston High School from five periods to six periods for the 1990–91 school year."

Some teachers were already teaching six classes each day. Junior high school teachers all regularly taught six classes each day without additional compensation. However, each high school teacher that taught six, rather than five, classes per day was being paid an extra $2,400 per year.

Although the 1989–1990 Negotiated Agreement between the District and the Williston Education Association, representing the teachers, did not expressly list the number of classes to be taught per day by teacher, an "Extra Duty Schedule" was incorporated in it. This two page schedule, designating additional compensation for advising and supervising extra-curricular activities, also included, near the end, a line saying "Extra Class" with an additional amount of compensation stated. The individual contract for each high school teacher that taught six classes, instead of five, carried a notation at the top left hand corner, "extra class," and showed the additional compensation in salary.

Soon after the District adopted the announced schedule of class periods for 1990–1991, the School Superintendent met with those high school teachers who were teaching an "extra class," or six periods, during the 1989–1990 school year. The Superintendent explained that there would be no extra compensation for teaching six classes during the next school year. He advised that "continuing contract law says ... that if [teachers] are not either non-renewed, or [teachers] don't resign that ... [teachers]

automatically have the contract [they] had for the past year." This group of teachers was given the choice of submitting a letter of conditional resignation, acknowledging that they would not receive extra pay for teaching six periods during the next school year, or going through a non-renewal hearing that would terminate their employment for the next year. Before March 5, 1990, each of this group submitted a letter of conditional resignation.

The Association and the District began contract negotiations for the 1990–1991 school year in April, 1990. There were no negotiations about the change in the standard number of daily classes to be taught during the ensuing school term. Unaccountably, the subject was not discussed. The final contract, "Williston Public School District No. 1 Negotiated Agreement 1990–1991," was signed by a District officer on September 14, 1990, and by an Association officer on September 25, 1990. Nothing in the final contract stated that the standard teaching day in the high school would be six, rather than five, classes. The "Extra Class $2,400.00" phrase remained the same in the "Extra Duty Schedule" of the Negotiated Agreement.

The Negotiated Agreement, like preceding ones, also contained this clause:

All terms and conditions of employment not covered by this agreement shall continue to be subject to the School Board's exclusive direction and control and shall not be subject to negotiations during the term of this agreement.

The parties refer to this as an "exclusive management" clause.

Eight teachers, who had taught an "extra class" in 1989–1990 and who had conditionally resigned in March 1990, signed individual 1990–1991 teaching contracts. The new individual contracts did not show any additional compensation for an "extra class". When the 1990–1991 school term began, all Williston high school teachers taught six classes per day. After receiving their first paycheck under the new contract, the eight teachers filed a grievance with the District board, claiming that all high school teachers were entitled to an additional $2,400 annually for teaching six, rather than five, classes per day. The District denied the grievance.

In December 1990, the Association sued the District, alleging that the 1990–1991 Negotiated Agreement contracted additional compensation for a high school teacher teaching an extra class over five classes per day. The Association contended that the District breached the Negotiated Agreement with the teachers by unilaterally increasing the number of classes per day from five to six, without paying for the extra class.

After a trial, the trial court found:

4. Negotiated agreements dating back to 1975 have stipulated that teachers would be compensated for teaching an "extra class". The 1975–76 agreement defines "extra class" by stating that "those teachers who teach an extra class (six periods rather than the standard five) will receive $1,000.00 in addition to their regular salary."

5. None of the subsequent negotiated agreements include the 1975–76 statement, and only indicate, in the extra duty schedule, that an extra class will receive certain compensation.

6. Prior to the 1990–91 school year, five class periods had comprised the standard teaching day for the high school teachers, and those who taught six were teaching an "extra class" and compensated an additional $2400.00 above their regular salaries.

\* \* \* \* \* \*

10. For the 1989–90 school term, a majority of the teachers at the high school were teaching five periods and, approximately ten teachers were receiving additional compensation of $2,400.00 for teaching an extra (sixth) class.

\* \* \* \* \* \*

12. Representatives of the [Association] and [the District] met seven times between April 26, 1990 and July 6, 1990 to discuss the 1990–91 negotiated agreement. During the negotiations, the parties did not negotiate nor present any proposals relating to the issue of the

standard teaching day, an increase from five to six periods at the high school, or the issue of additional compensation for an "extra class".

13. The 1990–91 negotiated agreement did not contain any specific language defining the standard teaching day. The Court finds that the standard teaching day for teachers at the high school is five periods, which was established through previous practice and the 1975–76 negotiated agreement.

The court reasoned that the phrase in the Negotiated Agreement, "extra class", was ambiguous and had "different meanings for the Junior and Senior High School" but that, for high school teachers, the phrase meant a sixth class.

The trial court concluded that the District did not have authority to unilaterally change the meaning of the contracted teaching day. The judgment ordered that high school teachers who taught a sixth class during the 1990–91 school year be compensated an additional $2,400 "in accordance with the agreement."

The District appeals, arguing that the trial court erred in finding an ambiguity and in ruling that the District lacked authority to increase the standard teaching day to six periods. Even if the agreement was ambiguous, the District argues further, the court could not use extrinsic evidence to negate the District's authority to change the standard teaching day because the subject was "not covered by the agreement."

Teacher contracts are subject to the same statutory rules of interpretation as other contracts of employment. NDCC 9–07–01; *Campbell v. Wishek Public School District,* 150 N.W.2d 840 (N.D.1967). *Cf.* NDCC 9–07–19 (Contract with public party interpreted against the private party if an uncertainty is not resolved by the other rules of interpretation); *see generally Walle Mutual Insurance Company v. Sweeney,* 419 N.W.2d 176 (N.D.1988). (NDCC 9–07–19 is a rule of last resort; it cannot apply to frustrate the intentions of the parties ascertained by other rules of contract interpretation).

The purpose of contract interpretation is to find the "mutual intention of the parties as it existed at the time of contracting." NDCC 9–07–03. If those intentions may be determined from the writing alone, the contract is not ambiguous. NDCC 9–07–04; *National Bank of Harvey v. International Harvester Company,* 421 N.W.2d 799 (N.D.1988). According to NDCC 9–07–02, if the contract is unambiguous, the language of the contract governs any dispute.

A contract is ambiguous when rational arguments can be made for different positions about its meaning. *National Bank of Harvey,* 421 N.W.2d at 801. Whether or not a contract is ambiguous is a question of law that we independently review on appeal. *Vanderhoof v. Gravel Products, Inc.,* 404 N.W.2d 485, 491 (N.D. 1987). If a contract is ambiguous, extrinsic evidence may be considered to determine its meaning.

We conclude that rational arguments are made for different interpretations of the contract phrase, "extra class." Therefore, the trial court properly determined from extrinsic evidence that the phrase was ambiguous.

When a contract is ambiguous, circumstances at the time of contracting may be used as evidence to construe it. NDCC 9–07–12; *Heitkamp v. Milbank Mutual Insurance Company,* 383 N.W.2d 834, 836 (N.D.1986). An ambiguity resolved by the use of extrinsic evidence is a question of fact for the trial court to decide. *National Bank of Harvey,* 421 N.W.2d at 803. On review, we will not set aside a finding of fact unless it is clearly erroneous. NDRCivP 52(a). A finding of fact is clearly erroneous only when, upon all the evidence, we are left with a definite and firm conviction that a mistake has been made.

The trial court's finding, that from 1975 to 1990 the contract phrase "extra class" for a high school teacher meant teaching a sixth class, is supported by the evidence. After the 1975 agreement with that meaning expressed, the contracting parties continued to use that definition in performing subsequent Negotiated Agree-

ments. A course of dealing and usage should be given effect in interpreting a contract ambiguity. NDCC 9–07–20; *Hager v. Devils Lake Public School District,* 301 N.W.2d 630, 634 (N.D.1981). Because the District and the Association both used "extra class" to mean teaching a sixth class for fifteen years, the trial court properly gave that meaning to the ambiguous phrase. The court should apply the same meaning placed upon the words of a contract as the parties themselves have given to those words. NDCC 9–07–09. The trial court's finding about the meaning of "extra class" is not clearly erroneous.

■ The District challenges the trial court's finding that the 1975–1976 document was, in fact, part of the Negotiated Agreement for that year. Although the document was signed by him, the business manager of the District for 27 years testified that it had not been intended as a part of that Negotiated Agreement. Instead, he said, it was only an "explanation" of the number of classes for a high school teacher to draw extra pay that year. The trial court believed that this expressed difference in effect was undiscernible. So do we. "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." NDRCivP 52(a). We conclude that the trial court's finding about the effect of the 1975–1976 document is not clearly erroneous.

■ Still, the District argues that the term "extra class" is a "term and condition[s] of employment not covered" by the 1990–1991 Negotiated Agreement, and is therefore "subject to the [District's] exclusive direction and control" under the "exclusive management" clause. Because the number of daily classes was not specifically negotiated for the 1990–1991 Agreement, the District argues that the "exclusive management" clause authorizes the District to increase the number to six classes without negotiations. Therefore, the District contends, the term "extra class" in the 1990–1991 Agreement must mean the teaching of a seventh class each day in the high school.

In making this argument, the District relies on the result reached in *Mandan Education Association v. Mandan Public School District No. 1,* 425 N.W.2d 917 (N.D.1988). In *Mandan,* the school district unilaterally changed the standard teaching day from five classes to six. In *Mandan,* the district's agreement with the organization representing the teachers did not spell out the number of classes in a standard teaching day, nor did it schedule additional compensation for teaching an extra class, while it did contain a similar exclusive management clause. We concluded in *Mandan* that the district was entitled to change the standard number of classes, absent any contract clause about the number of classes in the teaching day, or about additional compensation for teaching an extra class. Since the *Mandan* contract between the district and the teachers' organization did not cover the subject, we said that it was subject to the district's exclusive direction and control. *Mandan,* 425 N.W.2d at 918. Even so, we conclude that the Williston Agreement is different because it agreed to compensate teachers for an "extra class."

The District does not really dispute that for fifteen years the standard teaching day was five classes, and that the contract phrase "extra class" meant teaching a sixth class. Rather, the District asserts that the change in the standard school day was recommended by the citizens' committee to deal with the District's financial problems. The change occurred in good faith, and the teachers were notified of the plan well before negotiations began for the 1990–91 contract. That is true, but the trial court believed that these facts had little relevance to the meaning of the bilateral contract between the District and the teachers' organization.

An agreement cannot be altered unilaterally by one party to the contract. "Any question arising out of interpretation of an existent agreement" is to be negotiated in good faith between the district and the organization representing the teachers.

NDCC 15–38.1–12. *See also Fargo Education Association v. Fargo Public School District No. 1,* 291 N.W.2d 267 (N.D.1980). Only terms and conditions "not covered by this agreement" are subject to the District's exclusive control without negotiations. Here, the Negotiated Agreement "covered" teaching an extra class and the compensation for it.

Because the District unilaterally changed the contracted compensation for teaching an "extra class," we agree with the trial court that the District breached the 1990–91 Negotiated Agreement. We affirm the trial court's judgment that the District must pay the contracted compensation of $2,400 to each Williston high school teacher who taught an "extra," sixth class during the 1990–1991 school term.

We affirm.

ERICKSTAD, C.J., LEVINE and VANDE WALLE, JJ., and ALLAN L. SCHMALENBERGER, D.J., concur.

The Honorable ALLAN L. SCHMALENBERGER, D.J., sitting as a member of the Court to fill the vacancy created by the resignation of Justice H.F. GIERKE III. Justice JOHNSON not being a member of this Court at the time this case was heard did not participate in this decision.

VANDE WALLE, Justice, concurring specially.

I agree with the opinion authored for the Court by Justice Meschke. I write separately to note my dismay with the fact that the judicial system was required to decide this matter prior to negotiations between the parties to resolve the controversy.

There is no doubt that the matter of the number of class periods to be taught by each teacher is a matter for negotiations between the parties. "The scope of representation shall include matters relating to terms and conditions of employment and employer-employee relations, including, but not limited to, salary, hours, and other terms and conditions of employment." Section 15–38.1–09, NDCC. *See Fargo Ed. Ass'n v. Fargo Public Sch. Dist.,* 291 N.W.2d 267 (N.D.1980).

This controversy began prior to negotiations for the 1990–1991 school year were started in April 1990. Yet, as the majority opinion observes, "There were no negotiations about the change in the standard number of daily classes to be taught during the ensuing school term. Unaccountably, the subject was not discussed."

Section 15–38.1–12, NDCC, requires the parties to:

"negotiate in good faith with respect to:
a. Terms and conditions of employment and employer-employee relations.
b. * * *
c. Any question arising out of interpretation of an existent agreement.

　　*　　　*　　　*　　　*　　　*　　　*

The term "good faith" is defined by section 1–01–21, NDCC, to "consist in an honest intention to abstain from taking any unconscientious advantage of another *even through the forms or technicalities of law,* together with an absence of all information or belief of facts which would render the transaction unconscientious." [emphasis supplied]. That definition is applicable to the term "good faith" as used in Chapter 15–38.1, governing negotiations between school boards and teachers. *Fargo Ed. Ass'n v. Paulsen,* 239 N.W.2d 842 (N.D.1976). In that decision this court noted that the term " 'negotiate' simply means to present proposals and offer counterproposals, to discuss proposals, to carry on a dialogue, to exchange ideas, all for the purpose of persuading or being persuaded by logic and reasoning." 239 N.W.2d at 847. We further observed that "it is the art of friendly persuasion. The persuasion can result in an agreement and understanding of or a settlement of issues. It does not mean that an agreement must be reached." *Id.* Finally, the court commented that it is apparent that the term " 'negotiate in good faith' does not have any mysterious connotations or hidden meanings and as such it should not be too difficult to understand or to work within its framework." *Id.*

Despite this long standing elucidation of the purpose of Chapter 15–38.1, neither

party brought the subject to the bargaining table. Although both parties express various reasons for not doing so, it is apparent each party was aware of the other party's position on the matter. This is not the good faith negotiations to which the statutes refer. Rather, it appears both parties intended to rely on the "forms or technicalities of law" to the disadvantage of the other party, i.e., the school district intended to rely on the omission of any reference to the number of daily classes in the current contract and the exclusive management clause in the current contract, and the Education Association intended to rely on its contention that the term "extra class" was ambiguous and resort could be had to the 1975–76 agreement to resolve the ambiguity. Both positions present a "question arising out of interpretation of an existent agreement" which is specifically made a subject of negotiation pursuant to section 15–38.1–12(1)(c).

The negotiations statutes do not require that an agreement must be reached. *Far-* *go Ed. Ass'n v. Paulsen, supra.* Here the timing of the District's proposal made to increase the number of classes for the 1990–91 school year shortly before the start of negotiations for the 1990–91 contract, presented a unique opportunity to discuss the issue during those negotiations. Had the parties attempted to negotiate the matter and failed that would be the appropriate time to ask the courts to resolve the controversy. To ask the courts to resolve the issue prior to negotiations discredits the concept of negotiations. Were we empowered to do so, I would decline to decide the issue and require the parties to negotiate. But we do not pick and choose the disputes we are to resolve and I therefore concur in the majority opinion.