STATE OF NEBRASKA, APPELLEE, V. CLYDE WAYNE BRONSON,
APPELLANT.
496 N.W.2d 882

Filed March 12, 1993.    No. S-92-219.

Thomas M. Kenney, Douglas County Public Defender, and Thomas C. Riley for appellant.

Don Stenberg, Attorney General, and Donald A. Kohtz for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, FAHRNBRUCH, and LANPHIER, JJ.

HASTINGS, C.J.
Clyde Bronson appeals his conviction by a jury of first-degree murder and using a weapon to commit a felony. Bronson was sentenced to life imprisonment on the murder conviction and a consecutive sentence of 20 years for using a weapon to commit a felony.

Bronson alleges the trial court committed error in the following respects:

1. admitted into evidence appellant's custodial statements made prior to being "mirandized";

2. admitted irrelevant and unfairly prejudicial testimony concerning appellant's usage of controlled substances;

3. admitted out-of-court statements made by deceased's husband to the deceased;

4. denied appellant's "motion for a mistrial or alternatively to reinstate onto the jury panel certain African-American jurors peremptorily stricken by the prosecutor";

5. overruled appellant's objections and motion for mistrial which were based upon prosecutorial misconduct in the method of cross-examination of the appellant;

6. sustained conviction for murder despite the fact that the evidence presented at trial was so lacking in probative value that it was insufficient as a matter of law to sustain the conviction.

We affirm.

Barbara Smith was found dead by her husband the morning of June 28, 1991. The cause of death was determined to be multiple stab wounds to the chest and blunt injuries to the face and head. No evidence indicated forcible entry. As the Omaha Police Division crime lab searched the scene for fingerprints and other physical evidence, other officers contacted persons in the area regarding any information they may have had about the murder. Bronson, who lived two homes away from the victim, was questioned as he was returning from work. He indicated that he had last been to the Smith residence on June 27 to borrow $5 from Ken Smith, the victim's husband. On June 29 the police requested that appellant, as well as all other individuals known to have been in the Smith residence recently, go over to another neighbor's residence to be fingerprinted. One of Bronson's latent palm prints was found on the refrigerator and one of his patent fingerprints was observed in apparent blood on exhibit 9, a glass vase at the crime scene. Dr. Reena Roy, a forensic serologist, testified that a presumptive test for blood on the vase was positive. Linda Brokofsky, a fingerprint examiner for the Nebraska State Patrol, stated that she found a fingerprint in blood on the vase. Patricia Osier, a

senior crime lab technician with the Omaha Police Division examined the vase and found a fingerprint in what appeared to be blood.

On Monday, July 1, Police Officer Bill Jadlowski and Detective Wilson went to Bronson's home to ask him to accompany them to police headquarters for further interview. The officers arrived at the house and at about the same time Bronson was walking up the sidewalk. According to Jadlowski, the officers asked Bronson if they could step inside his residence and, once inside, explained to Bronson that they would like to "talk to him at Central Police Headquarters." Bronson was then taken to the police station. According to the officer, Bronson was not threatened, coerced, or promised anything, was not told he was under arrest, was not handcuffed, and rode in the back seat of the unmarked police car with the two officers in the front. Bronson, according to Jadlowski, was calm and cooperative.

Prior to having his *Miranda* rights explained to him, Bronson relayed the same story as to when he had last been in the Smith residence, and admitted that he was a recreational user of crack cocaine. When the police questioned him about several cuts on his hands, he explained that he had received a cut on his finger at work, and the other cuts on his hands were as a result of cleaning a crack-pipe with a wire coat hanger. At this point, the officers left the interrogation room for a short period, obtained a search warrant, returned to the interrogation room, and read Bronson his Miranda rights. Because Bronson indicated he wanted to see his attorney, the interrogation ceased. The officers returned Bronson to his home and proceeded with the execution of the warrant to search the Bronson residence. Sometime later Bronson was allowed to leave his home.

On Wednesday Bronson learned that a warrant for his arrest for first degree murder had been issued, and by arrangements made with the police by his lawyer, Bronson turned himself in on Friday morning.

At trial, Bronson supplemented his original statement, saying that while he had been in the house to borrow money, he also had visited the deceased, Barbara Smith, in her home

earlier that week for the purpose of carrying on a romantic affair with her.

A conviction will not be set aside unless the defendant meets his or her burden of showing that the claimed error created actual prejudice and not the mere possibility of prejudice. *State v. Valdez*, 239 Neb. 453, 476 N.W.2d 814 (1991).

## I. CUSTODIAL STATEMENTS

Bronson first assigns as error the admission into evidence of certain alleged custodial statements made by him to Omaha police officers before being apprised of his rights to counsel and against compulsory self-incrimination in compliance with *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

*Miranda* prohibits the use of statements stemming from the custodial interrogation of a defendant unless the prosecution demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.

For purposes of the *Miranda* rule prohibiting the prosecution from using statements stemming from a custodial interrogation of a defendant without the use of such procedural safeguards a "custodial interrogation" means questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his or her freedom of action in any significant way. *Oregon v. Mathiason*, 429 U.S. 492, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977). In that case, Mathiason had come down to the police station of his own accord in response to a note that a police officer had left for him at his residence indicating that the officer wanted to discuss something with him. The officer told him that he was not under arrest, but that the officer believed Mathiason had been involved in a specific burglary. After falsely stating that Mathiason's fingerprints had been found at the scene and within 5 minutes after arriving at the station, Mathiason confessed to the burglary. The officer then read Mathiason his *Miranda* warnings and obtained a taped confession.

The *Mathiason* Court found that a noncustodial situation is not converted to one in which the *Miranda* rule applies simply because a reviewing court concludes that, even in the absence of

any formal arrest or restraint on freedom of movement, the questioning took place in a coercive environment. Police officers are not required to administer *Miranda* warnings to everyone whom they question, or simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. Rather, *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody."

One is in custody for *Miranda* purposes when there is a formal arrest or a restraint on his or her freedom of movement of the degree associated with such an arrest. *State v. Victor*, 235 Neb. 770, 457 N.W.2d 431 (1990), citing *Berkemer v. McCarty*, 468 U.S. 420, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984). Determinations as to whether a person has been seized in this context are questions of fact. *State v. Victor, supra*, citing *State v. Bowersmith*, 224 Neb. 6, 395 N.W.2d 527 (1986).

The question of whether a person's consent to accompany law enforcement officials was in fact voluntary or was the product of duress or coercion, express or implied, is to be determined by the totality of the circumstances. *State v. Victor, supra*, citing *United States v. Mendenhall*, 466 U.S. 544, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980). In *Victor*, this court said:

> In the initial contact with Victor, a police officer merely asked the defendant to voluntarily accompany him to Central Police Station for questioning. Victor asked if he could leave his car where it was parked. The defendant was very cooperative, readily agreed to accompany the police, and was transported in an unmarked police car. Victor was not handcuffed.

235 Neb. at 782, 457 N.W.2d at 440.

Also, to be admissible in evidence, an accused's statement must be shown by the State to have been freely and voluntarily given and not to have been the product of any promise or inducement—direct or indirect—no matter how slight. However, this rule is not to be applied on a strict, per se basis. Rather, the determination of voluntariness is based upon an assessment of all of the circumstances and factors surrounding the occurrence when the statement is made, and the

determination made by the trial court in this regard will not be disturbed on appeal unless clearly wrong. *State v. Haynie*, 239 Neb. 478, 476 N.W.2d 905 (1991).

In *California v. Beheler*, 463 U.S. 1121, 103 S. Ct. 3517, 77 L. Ed. 2d 1275 (1983), Beheler and his stepbrother attempted to steal hashish from an individual who resisted. The stepbrother killed the individual and Beheler called the police and told them what had happened. Beheler voluntarily accompanied the police to the police station and was told that he was not under arrest. Beheler talked about the murder with the officers, but was not advised of his *Miranda* rights. He was permitted to leave, pending the district attorney's decision as to what charges to file, and 5 days later was arrested for aiding and abetting the murder. The Supreme Court held that *Miranda* warnings are not required if a suspect is not placed under arrest, voluntarily comes to the police station, and is allowed to leave unhindered by the police after a brief interview. The Court also stated that the fact that a person who voluntarily engages in an interview with police is unaware of the consequences of his participation does not transform a voluntary interview into a custodial one so as to require *Miranda* warnings. The warnings specified in *Miranda* are required only when there has been a restriction on a person's freedom as to render such person in custody. *Miranda* warnings are not required simply because the questioning takes place in a station house or because the questioned person is one whom the police suspect.

The question remains, was Bronson in custody for the purposes of *Miranda*?

In the matter at hand, Bronson had been explicitly told he was not under arrest, but that the officers wanted to discuss further the matter of the Smith murder investigation downtown. The officers testified that Bronson appeared calm, composed, and cooperative, and agreed to accompany them to the police station. He was escorted down to the station by officers without handcuffs in an unmarked detective's police car, during which time the men talked about Bronson's job, background, and family. Although Bronson asserts that he did not feel he had a choice, he voluntarily accompanied the officers down to the station.

The evidence indicates that despite the fact that Bronson was interrogated in "privacy" and in "unfamiliar surroundings", factors on which *Miranda* placed great stress, see *Miranda, Id.*, at 449-450, 86 S. Ct. 1602, 16 L. Ed. 694, considered from a totality of the circumstances, the interrogation here clearly does not rise to the level defined by the Supreme Court to be custodial interrogation. This assignment of error is without merit.

## II. EVIDENCE OF CONTROLLED SUBSTANCES USAGE

Bronson alleges in his second assignment of error that the trial court erroneously admitted statements he made to Omaha police officers regarding his history of crack cocaine abuse. The officers testified over objection that Bronson had informed them that he was a recreational user of crack cocaine and that he did not believe he had a problem with the drug. He then admitted that he was addicted to crack on payday, which was twice per month.

Bronson contends that the sole purpose of admitting this testimony was to aid in the establishment of a motive based on circumstantial evidence, that Bronson must have murdered Barbara Smith because she refused to loan or give him money to buy crack cocaine. Bronson further points out that no evidence existed that any money or valuables were missing from the Smith home.

Neb. Rev. Stat. § 27-404 (Reissue 1989) embodies Rule 404 of the Federal Rules of Evidence, which states in pertinent part, as follows:

(1) Evidence of a person's character or a trait of his or her character is not admissible for the purpose of proving that he or she acted in conformity therewith on a particular occasion, except:

(a) Evidence of a pertinent trait of his or her character offered by an accused, or by the prosecution to rebut the same;

. . . .

(2) Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to

show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Subsection 2 of this section, we have held, acts as an inclusionary rule which permits the use of evidence of other crimes, wrongs, or acts if relevant for any purpose other than the defendant's propensity or disposition to commit the crime with which he or she is charged. *State v. Christian*, 237 Neb. 294, 465 N.W.2d 756 (1991); *State v. Yager*, 236 Neb. 481, 461 N.W.2d 741 (1990); *State v. Boppre*, 234 Neb. 922, 453 N.W.2d 406 (1990); *State v. Methe*, 228 Neb. 468, 422 N.W.2d 803 (1988); *State v. Stewart* 219 Neb. 347, 363 N.W.2d 368 (1985).

It is within the discretion of the trial court to determine admissibility of evidence of other wrongs or acts and the trial court's decision will not be reversed absent abuse of that discretion. *State v. Christian*, 237 Neb. 294, 465 N.W.2d 756 (1991).

While proof of motive is not an element of first degree murder, any motive for the crime charged is certainly relevant to the State's proof of the intent element. Motive is defined by Black's Law Dictionary (6th Ed., 1990, p. 1014) as distinguished from "intent" as: "the moving course, the impulse, the desire that induces criminal action on the part of the accused." Similarly, this court has defined motive as that " 'which leads or tempts the mind to indulge in a criminal act.' " *State v. Ruyle*, 234 Neb. 760, 767, 452 N.W.2d 734, 739 (1990); *State v. Coca*, 216 Neb. 76, 82, 341 N.W.2d 606, 610 (1983).

The trial court properly admitted the testimony that Bronson had admitted to being a recreational crack user and that he was only occasionally addicted, if that were possible, to the substance. The testimony was admitted for a proper purpose and the assignment is without merit.

### III. STATEMENTS MADE BY DECEASED'S HUSBAND TO DECEASED

Bronson argues that the trial court committed reversible error through its admission into evidence of testimony

concerning out of court statements made by Kenneth Smith to the deceased. Bronson specifically claims the State was erroneously allowed to elicit testimony from Mr. Smith, husband of the deceased, that he had instructed his wife not to loan money to Clyde Bronson. Bronson contends that the admission of this testimony was not only hearsay and not within any exception, but also was extremely and unfairly prejudicial, and was admitted only to bolster the State's motive theory that Bronson had committed a hideous homicide for the purpose of obtaining money to support his crack cocaine habit.

We agree that the admission of testimony was proper as it was not hearsay. The difference lies in the obvious fact the prosecutor clearly did not try to submit the testimonial substance of any out-of-court statement made by the deceased to her husband and was not offered for the truth of the matter asserted therein. The testimony by Kenneth Smith was admitted for the permissible purpose of informing the jury that Smith had instructed his wife not to give Bronson any money. At no point was Smith asked what the deceased said in response to her husband's instructions, nor was he asked to convey or reveal the content of anything Barbara Smith may have said in response through his testimony of his own end of the conversation, which would have directly violated *United States v. Check*, 582 F.2d 668 (2d Cir. 1978).

In *United States v. Check, supra,* the prosecutor artfully inquired of an undercover narcotics agent what the agent had said to a confidential informant who did not testify. The agent was able to reveal via his own end of the conversation exactly what the informant had revealed to him. The Court of Appeals held that this testimony was inadmissible hearsay since the agent's testimony, although couched in terms of his own end of the conversation, revealed the precise substance of the statements made to him by the confidential informant.

An extra-judicial statement not offered to prove the truth of the matter asserted is not hearsay. *Gray v. Maxwell*, 206 Neb. 385, 389, 293 N.W.2d 90, 93 (1980). Kenneth Smith's testimony did not include any hearsay statements made by his wife and its admission was not improper. The assignment is without merit.

## IV. USE OF PEREMPTORY CHALLENGES
## TO STRIKE BLACK JURORS

Bronson alleges that the district court committed reversible error when it overruled his motion for mistrial attacking the prosecutor's use of peremptory challenges striking two of the three black venirepersons, Miles Gilreath and Louise Woolridge.

The prosecuting attorney offered the following response as to why he struck these jurors:

". . . Taking . . . Miles Gilreath, first, if I got it correctly, he was a program manager for ENCOR, which in effect is social work. And I've found that over the years people who are in that type of work have a tendency to blame misconduct or conduct of people on everyone except the people that are responsible for it. It's always some outside influence that caused them to act as they did, and I simply, on a case of this seriousness, don't want to take a chance with someone with a background like that. I also noted he's got some type of a criminal justice background, but that in effect wasn't really why. It was because of the program manager job at ENCOR. Also, he's a single person, and he is fairly young.

"The other juror, Louise Woolridge: if you take a look at all of my strikes, the only male I struck was Mr. Gilreath because, frankly, I was looking for males to be on this jury. And I may be mistaken about this, but I'd—I'd have to go through each of them individually, but I believe all of the other eleven jurors that I struck were women on the case, and I think—As a matter of fact, if you take—we must have had somewhat of the same idea because, if you look at at least the first six, seven or so of Mr. Riley's strikes, he was striking men off the jury. Obviously we were both going for a different—a different gender type of jury, and so we probably ended up just about half and half.

"But the reason that Miss Woolridge was struck is because she's an unmarried woman who indicated she had no prior jury experience, and I'm not sure how this factors in, but there were a couple of different times noticeably—notable that I can recall when the juror that

took Mr. Raumaker's place, Miss Brady, took the number 3 jury position, I began to question her, and with a couple of the questions—because I was having some trouble frankly reading just how Miss Woolridge was accepting me; and a couple of different times that the whole panel, that group of twelve that were there, I said a couple of things to kind of lighten the mood, and she sat there the entire time with a scowl on her face with her arms crossed, looking at me. And over the years I can't tell you what the psychological reason is. I just know I haven't had very good luck with people that look at me like that in the jury box. There was one other person that did the same thing . . . who sat with the same mannerisms toward me. She was in the back row, and I struck her also for the same reason, so those—On those two particular jurors, those are my reasons."

The court responded by making the following ruling.

THE COURT: "The defendant's challenge to The State's peremptory challenge of Louise Woolridge and Miles Gilreath is denied. The Court finds that one black juror remains who was not challenged by The State. The Court finds that the reason given for the peremptory challenge of Mr. Gilreath was valid insofar as The State expressed a desire to avoid social workers and ENCOR, Eastern Nebraska Commission on Retardation, is that type of work; and also his reason given for the strike of Miss Woolridge is consistent with challenges made—The State made to white women jurors, for the same reason in an effort to get more men on the jury. There were three black jurors to commence with. One-third of those jurors remains on the jury. One-third of the white jurors remain after the exercise of the challenges, and therefore I find The State gave sufficient valid reasons for the exercise of the peremptory challenges, and the objections to that exercise are denied or overruled."

Bronson is correct in stating that *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), bars prosecutors, through application of the Equal Protection Clause of the 14th Amendment from challenging potential

jurors "solely on the account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." 476 U.S. at 89. In order to make a prima facie case of discrimination in the selection of a jury, a criminal defendant must show that (1) she or he is a member of a cognizable racial group, (2) the prosecutor used peremptory challenges to remove members of the defendant's race from the venire, and (3) the facts and other relevant circumstances give rise to an inference that the prosecutor used those challenges to exclude potential jurors because of their race. *Batson v. Kentucky, supra.*

The Supreme Court more recently has stated that deference to the trial court's findings on the issue of discriminatory intent makes particular sense because the finding will largely turn on the evaluation of credibility. See *Hernandez v. New York*, 111 S. Ct. 1859, 114 L. Ed. 2d 395, 59 U.S.L.W. 4501 (1991).

The explanation of the State to provide a neutral explanation of a challenge under *Batson*, need not rise to the level of a challenge for cause, but neither may the prosecutor rebut defendant's prima facie case by stating that potential jurors were struck based on the intuitive judgment that they would be partial to the defendant because of their shared race. *Id.*; *State v. Martin*, 239 Neb. 339, 476 N.W.2d 536 (1991); *State v. Venable*, 233 Neb. 309, 444 N.W.2d 907 (1989).

The prosecutor's basis for his strikes need not even rise to the level of rationality. As we said in both *State v. Martin*, 239 Neb. 339, 342, 476 N.W.2d 536, 539 (1991) and *State v. Walton*, 227 Neb. 559, 564, 418 N.W.2d 589, 593 (1988), "[T]he trial court need not determine if the explanation is reasonable, but only that it is nondiscriminatory and is constitutionally permissible."

In *Polk v. Dixie Ins. Co.*, 972 F.2d 83 (5th Cir. 1992) (cert. denied), the opinion recited that the original judgment of the district court was affirmed by the Court of Appeals, holding that *Batson's* prohibition of racial use of peremptory challenges did not extend to private parties. The Supreme Court however, holding that *Batson* did apply to civil suits between private parties, remanded the cause for further consideration. The Court of Appeals then directed the district court to hold a

hearing to determine whether the defendant could show non-racial reasons for its exercise of peremptory challenges. The district court determined that the defendant did show such reasons and the Court of Appeals affirmed, stating:

> After the court (district) found that the Polks had made a prima facie case, Dixie's counsel stated that she could not remember why she had struck the two black jurors, noting that three to four years had elapsed since the 1988 trial of the case. She asserted, however, that eyeball contact must have been the reason because "I can tell the Court for sure that the element of eyeball contact is the turning factor in every decision I make in every case I try."

*Id.* at 84.

The court went on to state:

> In the *Batson* context, subjective consideration might not be susceptible to objective rebuttal or verification. We nonetheless permit them because of the inherent nature of peremptory challenges, with the understanding that ultimate *Batson* findings "largely will turn on evaluation of credibility" of counsel's explanation.
>
> . . . .
>
> We cannot say that eye contact necessarily is a phony reason when it is proffered as justification for removal of all black jurors.

*Id.* at 86. See, also, *United States v. Nicholson*, 885 F.2d 481 (8th Cir. 1989).

We accept this reasoning and find that the prosecutor met his burden. He struck two out of three black venirepersons on the panel and gave completely nondiscriminatory, rational, and legitimate reasons for striking Mr. Gilreath. As to the basis for his strike of Miss Woolridge, we are cognizant of the importance of achieving a venire made up of jurors who, at least during voir dire, (1) respond to the attorneys, (2) do not give off the impression through body language, eye contact or otherwise that he or she has already made up his or her mind, and (3) exhibit a receptiveness to follow the administrative instructions, as well as courtroom testimony in order to make a fair and impartial decision in the matter at hand. Miss Woolridge exhibited nonverbal behaviors that indicated that

she may not have been capable of being a responsible venireperson and the prosecutor's peremptory strike of her was not racially based.

### V. MOTION FOR MISTRIAL

In Bronson's fifth assignment he asserts that the court erred by refusing to sustain his motion for mistrial based on alleged prosecutorial misconduct in his method of cross-examination of Bronson. Bronson specifically argues that the prosecutor repeatedly engaged in argumentative questioning, recapitulating the testimony of previous State witnesses, and, in certain instances, allegedly recounted testimony inaccurately.

A mistrial is properly granted only when an event occurs during the course of a trial which is of such a nature that its damaging effects cannot be removed by proper admonition or instruction to the jury and would thus result in preventing a fair trial. The decision to grant a motion for mistrial is within the discretion of the trial court and will be upheld on appeal absent a showing of abuse of discretion. *State v. Palser*, 238 Neb. 193, 469 N.W.2d 753 (1991). In order for error to be predicated upon misconduct of counsel, it must be so flagrant that neither retraction nor rebuke from the court can entirely destroy its influence. *State v. Valdez*, 239 Neb. 453, 476 N.W.2d 814 (1991).

Before it is necessary to grant a mistrial for prosecutorial misconduct, the defendant must show that a substantial miscarriage of justice occurred. *State v. Zaritz*, 235 Neb. 599, 456 N.W.2d 479 (1990); *State v. Valdez, supra.*

In the absence of an abuse of discretion, a trial court's ruling regarding the extent, scope, and course of cross-examination will be upheld on appeal. *State v. Dixon*, 240 Neb. 454, 482 N.W.2d 573 (1992); *State v. Blair*, 230 Neb. 775, 433 N.W.2d 518 (1988).

Although a witness is erroneously permitted to be cross-examined as to matters not brought out on direct examination, the judgment will not be reversed when it appears that no prejudice could have resulted. *Sheppard v. State*, 168 Neb. 464, 96 N.W.2d 261 (1959).

While the prosecutor clearly did recapitulate a great deal of

testimony, a method of cross-examination of which we disapprove because it is likely to lead to prejudice, the information used was couched in questioning whether Bronson indeed remembered the testimony, requiring simple yes or no answers in a concerted effort to unveil apparent inconsistencies and illogical explanations in Bronson's testimonial account.

Bronson also complains that the prosecutor in cross-examining Bronson constantly referred to Bronson's fingerprint as having been found in blood on the vase. On objection at one point, at least, the court stated that the witness had testified both ways. "Found in blood" was a permissible inference that could be drawn from the evidence, and, as the trial court suggested, both the prosecutor and the defense counsel were trying to argue their case through questions and objections.

It was up to the jury to draw its own conclusion from the testimony of the witnesses and its observation of the photograph of exhibit 9. Bronson has not shown that or how he was prejudiced, or that a substantial miscarriage of justice actually occurred.

The trial court properly refused to grant Bronson's motion for mistrial, and accordingly, the assignment is without merit.

## VI. INSUFFICIENCY OF THE EVIDENCE

In determining whether evidence is sufficient to sustain a conviction in a jury trial, an appellate court does not resolve conflicts of evidence, pass on credibility of witnesses, evaluate explanations, or reweigh evidence presented to a jury, which are within the jury's province for disposition. A verdict in a criminal case must be sustained if the evidence, viewed and construed in a light most favorably to the State, is sufficient to support that verdict. *State v. Sexton*, 240 Neb. 466, 483 N.W.2d 567 (1992); *State v. Brown*, 225 Neb. 418, 405 N.W.2d 600 (1987).

Of the nine latent prints taken into evidence by law enforcement officers, only a latent print found inside the deceased's wallet remained unidentified.

Clyde Bronson's palm print was found on the refrigerator and an imprint from his middle finger was found in apparent blood on a flower vase near Barbara Smith's body. Appellant

and Kenneth Smith both stated that when Bronson stopped over at the Smith residence to borrow money from Smith on the morning of June 27, 1991, Bronson did not venture any farther into the Smith home than the entryway. Type "O" blood (consistent with both the deceased and the defendant) was found in the Bronson home on a Tide bottle, two doorknobs, a section of a door, and a shower curtain.

Reena Roy testified on cross-examination as follows:

Q. Could you tell the jury what percentage of the population has O type blood?

. . . .

A. (After looking in a briefcase) Among the Caucasian population, which is the white population, type O blood is found approximately in 45% of the population. Among blacks it is approximately 49 to 50% of the population.

Bronson had many fresh cuts on his hand. Bronson's wife testified that while one deep cut on his index finger had occurred prior to her departure for Texas during the week before the murder, the other fresh cuts in her husband's palm were not present. Bronson asserted that he had been in the Smith residence numerous times over the past few months to watch sports activities on television. Kenneth Smith stated that Bronson had only been in the Smith home once other than the day of the murder to borrow money. To Smith's knowledge, Bronson had only been in the basement of his home. Bronson had originally told officers that he had been engaging in sexual activity with a young female acquaintance the night of the murder, but she stated that she had stopped over at the Bronson home for a few minutes, but left immediately after he told her that she had to loan him money.

One of the primary functions of the criminal law is to protect individuals and society from the depredations of the criminally bent. *State v. Haynie*, 239 Neb. 478, 476 N.W.2d 905 (1991), *State v. Ethchison*, 188 Neb. 134, 195 N.W.2d 498 (1972).

The evidence is sufficient to sustain Bronson's conviction and we find no abuse of discretion from the record.

Finding no merit in any of the errors alleged by the appellant Bronson, judgment of the district court is affirmed.

AFFIRMED.